399 A.2d 469.

STATE *vs.* BRUCE L. JOHNSON.

FEBRUARY 9, 1979.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

DORIS, J.  The sole issue presented by this appeal is whether this court should abandon the *M'Naghten* test in favor of a new standard for determining the criminal responsibility of those who claim they are blameless by reason of mental illness.[1] *State* v. *Johnson,* 119 R.I. 749, 383 A.2d 1012, 1013 (1978). For the reasons stated herein, we have concluded that the time has arrived to modernize our rule governing this subject.

Before punishing one who has invaded a protected interest, the criminal law generally requires some showing of culpability in the offender. The requirement of a mens rea, or guilty mind, is the most notable example of the concept that before punishment may be exacted, blameworthiness must be demonstrated. That some deterrent, restraint, or rehabilitative purpose may be served is alone insufficient. It has been stated that the criminal law reflects the moral sense of the community. "The fact that the law has, for centuries, regarded certain wrongdoers as improper subjects for punishment is a testament to the extent to which that moral sense has developed. Thus, society has recognized over the years that none of the three asserted purposes of the criminal law — rehabilitation, deterrence, and retribution — is satisfied when the truly irresponsible, those who lack substantial capacity to control their actions, are punished." *United States* v. *Freeman,* 357 F.2d 606, 615 (2d Cir. 1966). The law appreciates that those who are substantially unable to restrain their conduct are, by definition, incapable of being

---

[1]As we indicated in *State* v. *Nault,* 112 R.I. 687, 688 n.1, 314 A.2d 627, 628 n.1 (1974), we prefer to avoid use of the term "insanity defense." Therefore, throughout this opinion we shall use the phrase "[defense] of lack of criminal responsibility due to a mental illness."

deterred and their punishment in a correctional institution provides no example for others.

The law of criminal responsibility has its roots in the concept of free will. As Mr. Justice Jackson stated:

> "How far one by an exercise of free will may determine his general destiny or his course in a particular matter and how far he is the toy of circumstance has been debated through the ages by theologians, philosophers, and scientists. Whatever doubts they have entertained as to the matter, the practical business of government and administration of the law is obliged to proceed on more or less rough and ready judgments based on the assumption that mature and rational persons are in control of their own conduct." *Gregg Cartage & Storage Co.* v. *United States*, 316 U.S. 74, 78-80, 62 S.Ct. 932, 935, 86 L.Ed. 1283, 1288 (1942).

Our law proceeds from this postulate and seeks to fashion a standard by which criminal offenders whose free will has been sufficiently impaired can be identified and treated in a manner that is both humane and beneficial to society at large. The problem has been aptly described as distinguishing between those cases for which a correctional-punitive disposition is appropriate and those in which a medical-custodial disposition is the only kind that is legally permissible. *See* Model Penal Code, §4.01, Comment at 156 (Tent. Draft. No. 4, 1955).

Because language is inherently imprecise and there is a wide divergence of opinion within the medical profession, no exact definition of "insanity" is possible. Goldstein, *The Insanity Defense* 87 (1967). Every legal definition comprehends elements of abstraction and approximation that are particularly difficult to apply in marginal cases. Our inability to guarantee that a new rule will always be infallible, however, cannot justify unyielding adherence to an outmoded standard, sorely at variance with contemporary medical and legal knowledge. Any legal standard designed to assess criminal responsibility must satisfy several objectives.

It must accurately reflect the underlying principles of substantive law and community values while comporting with the realities of scientific understanding. The standard must be phrased in order to make fully available to the jury such psychiatric information as medical science has to offer regarding the individual defendant, yet be comprehensible to the experts, lawyers, and jury alike. Finally, the definition must preserve to the trier of facts, be it judge or jury, its full authority to render a final decision. *See United States* v. *Smith*, 404 F.2d 720, 726 (6th Cir. 1968); *Bethea* v. *United States*, 365 A.2d 64, 76 (D.C.Ct.App. 1976). These considerations are paramount in our consideration of the rule to be applied in this jurisdiction in cases in which the defense of lack of criminal responsibility due to a mental illness is raised.

I

The historical evolution of the law of criminal responsibility is a fascinating, complex story. For purposes of this opinion, however, an exhaustive historical discussion is unnecessary; a brief sketch will therefore suffice. The renowned "right-wrong" test had antecedents in England as early as 1582. In that year the *Eirenarcha*, written by William Lambard of the Office of the Justices of Peace, laid down as the test or criminal responsibility "knowledge of good or evil." *See United States* v. *Currens*, 290 F.2d 751, 764 (3dCir. 1961). During the 1700's the language of the test shifted its emphasis from "good or evil" to "know." *See United States* v. *Freeman*, 357 F.2d at 616. During the eighteenth century, when these tests and their progeny were evolving, psychiatry was hardly a profession, let alone a science. Belief in demonology and witchcraft was widespread and became intertwined with the law of responsibility. So eminent a legal scholar as Blackstone adamantly insisted upon the existence of witches and wizards as late as the later half of the eighteenth centruy. Biggs, *The Guilty Mind* 61-62 (1955). The psychological theories of phrenology and monomania thrived and influenced the development of the "right

and wrong" test.[2] Both of these compartmentalized concepts have been soundly rejected by modern medical science which views the human personality as a fully integrated system. By historical accident, however, the celebrated case of Daniel M'Naghten froze these concepts into the common law just at the time when they were beginning to come into disrepute. *See generally id.* at 81-107.

Daniel M'Naghten attempted to assassinate Sir Robert Peel, Prime Minister of England, but mistakenly shot Peel's private secretary instead. This assassination had been preceded by several attempts on the lives of members of the English Royal House, including Queen Victoria herself. When M'Naghten was tried in 1843 the jury was charged with a test heavily influenced by the enlightened work of Dr. Isaac Ray who was severely critical of the "right and wrong" rule. *See* Ray, *Medical Jursiprudence of Insanity* (1838). After the jury acquitted M'Naghten the public indignation, spearheaded by the Queen, was so pronounced that the Judges of England were summoned before the House of Lords to justify their actions. In an extraordinary advisory opinion, issued in a pressure-charged atmosphere, Lord Chief Justice Tindal, speaking for all but one of the 15 judges, reversed the charge used at trial and articulated what has become known as the *M'Naghten* rules. *See, e.g., United States* v. *Freeman,* 357 F.2d at 617; *United States* v. *Currens,* 290 F.2d at 763-64; Biggs, *supra* at 95-102; Glueck, *Mental Disorder and the Criminal Law* 162-163 (1925). The principal rule in *M'Naghten's Case,* 8 Eng. Rep. 718 (1843) states:

> "To establish a defense on the ground of insanity it must be clearly proved that, at the time of committing

---

[2]Phrenologists viewed the brain as divided into 35 distinct areas. Each area controlled a specific mental function. The sixth area, for example, was denominated "destructiveness." Monomania was a state of mind in which a single insane idea predominated while the rest of the thought processes remained normal. *United States* v. *Freeman,* 357 F.2d 606, 616 (2d Cir. 1966).

the act, the party accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it, that he did not know that what he was doing was wrong." 8 Eng. Rep. at 722.

This dual-pronged test, issued in response to the outrage of a frightened Queen, rapidly became the predominant rule in the United States.

This jurisdiction has long adhered to the *M'Naghten* standard for determining criminal responsibility. In *State v. Quigley*, 26 R.I. 263, 58 A. 905 (1904), this court intimated that the dual-pronged test of *M'Naghten* was the prevailing view in Rhode Island. Yet, in *State v. Andrews*, 86 R.I. 341, 134 A.2d 425 (1957), where we expressly adopted *M'Naghten*, reference was made only to the knowledge of "right and wrong" portion of that test. *Id.* at 352, 134 A.2d at 432. Although it has not always been clear whether the "nature and quality" component of *M'Naghten* is included as part of the formal rule in this jurisdiction,[3] *compare State v. Page*, 104 R.I. 323, 332, 244 A.2d 258, 263 (1968) *and State v. Jefferds*, 91 R.I. 214, 216, 162 A.2d 536, 538 (1960) *with State v. Nault*, 112 R.I. 687, 690, 314 A.2d 627, 629 (1974), as a matter of practice expert witnesses testify concerning both parts of the rule. *See State v. Page*, 104 R.I. at 332, 244 A.2d at 263. Unlike several other jurisdictions, Rhode Island has never augmented *M'Naghten* with the "irresistible impulse doctrine."

---

[3] One authority has noted:

"Despite the inclusion of alternative tests in the original M'Naghten case, the most common form in which the M'Naghten test now appears is 'whether the defendant had the capacity to know right from wrong in respect to the particular act charged.' Most jurisdictions which apply *M'Naghten* seem to assume that the requirement of 'knowing the nature and quality of the act' adds nothing to the right-wrong test. A cogent argument might be made that a person may be able to retain intellectual knowledge of right and wrong and yet not understand the 'nature and quality' of his act (i.e. its social significance)." Brakel & Rock, *The Mentally Disabled and the Law* 379-80 (rev. 2d ed. 1971).

## II

The *M'Naghten* rule has been the subject of considerable criticism and controversy for over a century. *See generally United States* v. *Currens*, 290 F.2d at 765-66. The test's emphasis upon knowledge of right or wrong abstracts a single element of personality as the sole symptom or manifestation of mental illness. *M'Naghten* refuses to recognize volitional or emotional impairments, viewing the cognitive element as the singular cause of conduct. *See United States* v. *Freeman*, 357 F.2d at 618; *Durham* v. *United States*, 214 F.2d 862, 871-72 (D.C.Cir. 1954); Glueck, *supra* at 226-27, 428-29. One scholar has stated that:

> "[t]he principle behind M'Naghten, namely, that defect of cognition as a consequence of mental disease is the primary exculpating factor in the determination of legal insanity, has probably never been other than a legal fiction." Diamond, *From M'Naghten to Currens, and Beyond*, 50 Calif.L.Rev. 189, 189 (1962).

*M'Naghten* has been further criticized for being predicated upon an outmoded psychological concept because modern science recognizes that "insanity" affects the whole personality of the defendant, including the will and emotions. *Durham* v. *United States*, 214 F.2d at 871; *Royal Commission on Capital Punishment, Report 80*, (1953). One of the most frequent criticisms of *M'Naghten* has been directed at its all-or-nothing approach, requiring total incapacity of cognition. *See Wade* v. *United States*, 426 F.2d 64, 71 (9th Cir. 1970); *People* v. *Drew*, 22 Cal.3d 338, 337, 583 P.2d 1318, 1322, 149 Cal.Rptr. 275, 279 (1978); *Hill* v. *State*, 252 Ind. 601, 607, 251 N.E.2d 429, 432 (1969). We agree that:

> "Nothing makes the inquiry into responsibility more unreal for the psychiatrist than limitation of the issue to some ultimate extreme of total incapacity, when clinical experience reveals only a graded scale with marks along the way. * * *
>
> "The law must recognize that when there is no black and

white it must content itself with different shades of gray."
Model Penal Code, §4.01, Comment at 158 (Tent. Draft
No. 4, 1955).

By focusing upon total cognitive incapacity, the *M'Naghten*
rule compels the psychiatrist to testify in terms of unrealistic
concepts having no medical meaning. Instead of scientific
opinions, the rule calls for a moral or ethical judgment from
the expert which judgment contributes to usurpation of the
jury's function as decision maker. *See United States* v.
*Currens*, 290 F.2d at 767; Weihofen, *Mental Disorder as a
Criminal Defense* 65 (1954).

Probably the most common criticism of *M'Naghten* is that
it severely restricts expert testimony, thereby depriving the
jury of a true picture of the defendant's mental condition.
*See, e.g., United States* v. *Freeman*, 357 F.2d at 620; *Hill* v.
*State*, 252 Ind. at 606, 251 N.E.2d at 432. This contention
has been seriously questioned by some commentators who
find no support for the argument that *M'Naghten* inhibits the
flow of testimony on the responsibility issue. Goldstein,
*supra*, at 53; *accord*, Matthews, *Mental Disability and the
Criminal Law* 44-46 (1970). As a matter of practice in this
jurisiction, expert testimony under *M'Naghten* has been
unrestricted and robust. Nevertheless, we are convinced that
this testimony would be more meaningful to the jury were it
not for the narrow determination demanded by *M'Naghten*.

That these criticisms have had a pronounced effect is
evidenced by the large and growing number of jurisdictions
that have abandoned their former allegiance to *M'Naghten* in
favor of the Model Penal Code formulation. *See* notes at 6 &
7 *infra*. We also find these criticisms persuasive and agree
that *M'Naghten's* serious deficiencies necessitate a new
approach.[4]

---

[4]The defense of lack of criminal responsibility due to a mental illness in this
jurisdiction is a judicial creation which we are free to alter. *Cf. Digby* v. *Digby*,
120 R.I. 299, 388 A.2d 1 (1978). Although the majority of states that have
abandoned *M'Naghten* have done so legislatively, *see* note 6 *infra*, in most of those

## III

Responding to criticism of *M'Naghten* as a narrow and harsh rule, several courts supplemented it with the "irresistible impulse" test. *E.g., Parsons v. State,* 81 Ala. 577, 2 So. 854 (1886); *See* Annot. *Irresistible Impulse as an Excuse for Crime,* 173 A.L.R 391 (1948); Keedy, *Irresistible Impulse as a Defense in the Criminal Law,* 100 U.Pa.L.Rev. 956 (1952). Under this combined approach, courts inquire into both the cognitive and volitional components of the defendant's behavior. Although a theoretical advance over the stringent right and wrong test, the irresistible impulse doctrine has also been the subject of wide-spread criticism. Similar to *M'Naghten's* absolutist view of capacity to know, the irresistible impulse is considered in terms of a complete destruction of the governing power of the mind. *See United States v. Frazier,* 458 F.2d 911, 917 (8th Cir. 1972); *United States v. Freeman,* 357 F.2d at 620. A more fundamental objection is that the test produces the misleading notion that a crime impulsively committed must have been perpetrated in a sudden and explosive fit. Thus, the irrestible impulse test excludes those "far more numerous instances of crimes committed after excessive brooding and melancholy by one who is unable to resist sustained psychic compulsion or to make any real attempt to control his conduct." *Id.* at 620-21; *see United States v. Smith,* 404 F.2d at 725.

The most significant break in the century-old stranglehold of *M'Naghten* came in 1954 when the Court of Appeals for the District of Columbia declared that, "an accused is not criminally responsible if his unlawful act was the product of

jurisdictions the defense was statutorily derived. Our determination that we can judicially alter the standard is buttressed by the Legislature's conscious inactivity in this area. In 1965 the Legislative Council issued a comprehensive report recommending that any changes in this field be left to the initiative of this court. *See* Rhode Island Legislative Council, *Mental Responsibility for Criminal Behavior* 27-28 (1965). Since that time we have twice expressed our willingness to reconsider the continued viability of *M'Naghten. State v. Nault,* 112 R.I. 687, 691, 314 A.2d 627, 629 (1974); *State v. Page,* 104 R.I. 323, 333, 244 A.2d 258, 263 (1968). The Legislature's inactivity in this context reflects to us their adherence to the recommendations of the 1965 report.

mental disease or mental defect." *Durham* v. *United States*, 214, F.2d 862, 874-75 (D.C.Cir. 1954). The "product" test, first pioneered by the Supreme Court of New Hampshire in *State* v. *Pike*, 49 N.H. 399, 402 (1869), was designed to facilitate full and complete expert testimony and to permit the jury to consider all relevant information, rather than restrict its inquiry to data relating to a sole symptom or manifestation of mental illness. *Durham* generated voluminous commentary and made a major contribution in recasting the law of criminal responsibility. In application, however, the test was plagued by significant deficiencies. The elusive, undefined concept of productivity posed serious problems of causation and gave the jury inadequate guidance. *United States* v. *Freeman*, 357 F.2d at 621. Most troublesome was the test's tendency to result in expert witnesses' usurpation of the jury function. As a result, in *Washington* v. *United States*, 390 F.2d 444, 455-56 (D.C. Cir. 1967), the court took the extreme step of proscribing experts from testifying concerning productivity altogether. Finally, in *United States* v. *Brawner*, 471 F.2d 969 (D.C. Cir. 1972), the court abandoned *Durham*, decrying the "trial by label" that had resulted. *Id.* at 977. The author of *Durham*, Chief Judge Bazelon, stated that testimony couched in terms of the legal conclusion that an act was or was not the product of mental disease invited the jury to abdicate its responsibility as ultimate decision maker and acquiesce in the experts' conclusions. *Id.* at 1017 (Bazelon, C.J., concurring & dissenting).

Several commentators have advocated abolition of the separate defense of lack of criminal responsibility due to a mental illness. *See, e.g.,* Dershowitz, *Abolishing the Insanity Defense; The Most Significant Feature of the Administration's Criminal Code-An Essay,* 9 Crim.L.Bull. 434 (1973); Goldstein & Katz, *Abolish the "Insanity Defense" — Why Not?,* 72 Yale L.J. 853 (1963). Proponents contend that abolition would result in the responsibility issue being more properly considered as the existence vel non of the mens rea. Under a common proposal the criminal process would be bifurcated; first, the jury would resolve the question of guilt,

and second, a panel of experts would determine the appropriate disposition. Arguably, abolition of the separate defense is subject to constitutional objections because it potentially abrogates the right to trial by jury and offends the guarantee of due process. We believe that such a drastic measure, if advisable at all, is appropriately left to the legislative process. *Accord., United States* v. *Brawner,* 471 F.2d at 985; *Bethea* v. *United States,* 365 A.2d at 73 n.19.

## IV

Responding to the criticism of the *M'Naghten* and irresistible impulse rules, the American Law Institute incorporated a new test of criminal responsibility into its Model Penal Code.[5] The Model Penal Code has received widespread and evergrowing acceptance. It has been adopted with varying degrees of modification in 26 states[6]

---

[5] "(1) A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law.

"(2) As used in this article, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." Model Penal Code, §4.01 (Final Draft, 1962).

[6] The following 18 states have clearly adopted the Model Penal Code test: Alaska — *Alaska Stat.* §12.45.083 (1972); California — *People* v. *Drew,* 22 Cal. 3d 318, 583 P.2d 1318, 149 Cal. Rptr. 275 (1978); Connecticut — *Conn. Gen. Stat.* §53a-13 (1972); Hawaii — *Haw. Rev. Stat.* §704-400 (1976); Idaho — *State* v. *White,* 93 Idaho 153, 456 P.2d 797 (1969); Illinois — *Ill. Rev. Stat.* ch. 38, §6-2 (1972); Indiana — *Hill* v. *State,* 252 Ind. 601, 251 N.E.2d 429 (1969); Maine — *Me. Rev. Stat.* tit. 17-A, §58 (Supp. 1978); Maryland — *Md. Code Ann.* art. 59, §25(a) (1972); Massachusetts — *Commonwealth* v. *McHoul,* 352 Mass. 544, 226 N.E.2d 556 (1967); Missouri — *Mo. Rev. Stat.* §552.030 (1969); Oregon — *Or. Rev. Stat.* §161.295 (1973); Tennessee — *Graham* v. *State,* 547 S.W.2d 531 (Tenn., 1977); Utah — *Utah Code Ann.* §76-2-305 (1977); Vermont — *Vt. Stat. Ann.* tit. 13, §4801 (1974); West Virginia — *State* v. *Myers,* 222 S.E.2d 300 (W. Va., 1976); Wisconsin — *Wis. Stat.* §971.15 (1971); Wyoming — Wyo. Stat. §7-11-304 (1977).

Additionally, eight states and the District of Columbia have adopted the Model Penal Code test with some modification: Arkansas — *Ark. Stat. Ann.* §41-601 (1977) (omits "substantial"); Delaware — *Del. Code tit. 11,* §401 (1975) (volitional test phrased "sufficient willpower to choose whether he would do the act or refrain from doing it"); District of Columbia — *Bethea* v. *United States,* 365 A.2d 64 (D.C. 1976) ("recognize" rather than "appreciate"); Kentucky — *Graham* v.

and by every federal court of appeals that has addressed the issue.[7] Although no definition can be accurately described as the perfect or ultimate pronouncement, we believe that the Model Penal Code standard represents a significant, positive improvement over our existing rule. Most importantly, it acknowledges that volitional as well as cognitive impairments must be considered by the jury in its resolution of the responsibility issue. The test replaces *M'Naghten's* unrealistic all-or-nothing approach with the concept of "substantial" capacity. Additionally, the test employs vocabulary sufficiently in the common ken that its use at trial will permit a reasonable three-way dialogue between the law-trained judges and lawyers, the medical-trained experts, and the jury. *See United States* v. *Brawner,* 471 F.2d at 983.

■  Without question the essential dilemma in formulating any standard of criminal responsibility is encouraging a maximum informational input from the expert witnesses while preserving to the jury its role as trier of fact and ultimate decision maker. As one court has aptly observed:

> "At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psychiatrists

---

*Commonwealth,* 420 S.W.2d 575 (Ky. 1967) (different phraseology throughout); Michigan — *Mich. Stat. Ann.* §28.1044(1) (1978) (uses terms "mental illness" and "mental retardation" which are specifically defined); Montana — *Mont. Rev. Codes Ann.* §95-501(a) (1969) ("unable either to" rather than "lacked substantial capacity"); New York — *N.Y. Penal Law* §30.04 (McKinney 1975) (omits volitional test); Ohio — *State* v. *Staten,* 25 Ohio St. 2d 107, 267 N.E.2d 122 (1971) (omits "substantial" and uses "know" rather than "appreciate"); Texas — *Tex. Penal Code Ann.* §8.01 (Vernon 1974) ("know" rather than "appreciate").

[7]*United States* v. *Freeman,* 357 F.2d 606 (2d Cir. 1966); *United States* v. *Currens,* 290 F.2d 751 (3d Cir. 1961); *United States* v. *Chandler,* 393 F.2d 920 (4th Cir. 1968); *Blake* v. *United States,* 407 F.2d 908 (5th Cir. 1969); *United States* v. *Smith,* 404 F.2d 720 (6th Cir. 1968); *United States* v. *Shapiro,* 383 F.2d 680 (7th Cir. 1967); *United States* v. *Frazier,* 458 F.2d 911 (8th Cir. 1972); *Wade* v. *United States,* 426 F.2d 64 (9th Cir. 1970); *Wion* v. *United States,* 325 F.2d 420 (10th Cir. 1963); *United States* v. *Brawner,* 471 F.2d 969 (D.C. Cir. 1972).

The First Circuit court has not had recent occasion to address this issue. *See Amador Beltran* v. *United States,* 302 F.2d 48 (1st Cir. 1962). The *Currens* test is singularly distinctive because of its exclusive focus upon volitional impairments. *See United States* v. *Currens, supra* at 774.

— much like experts in other fields — should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused — his characteristics, his potentialities, his capabilities. But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts." *United States* v. *Freeman,* 357 F.2d at 619-20.

Because of our overriding concern that the jury's function remain inviolate, we today adopt the following formulation of the Model Penal Code test:

A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible.

The terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.[8]

There are several important reasons why we prefer this formulation. The greatest strength of our test is that it clearly

---

[8]This test was proposed as an alternative by the minority of the American Law Institute Council that drafted the Model Penal Code. One of its most forceful advocates was Professor Herbert Wechsler, the reporter for the Model Penal Code. *See* Wechsler, *The Criteria of Criminal Responsibility,* 22 U. Chi. L. Rev. 367, 372 (1955). The test is substantially similar to the tests proposed by the British Royal Commission on Capital Punishment in 1953, *see United States* v. *Brawner,* 471 F.2d at 986 n.23 and by Chief Judge Bazelon in 1972, *see id.* at 1030-34 (Bazelon, C.J., concurring & dissenting). The majority of the A.L.I. Council rejected this alternative because they deemed it unwise to present questions of justice to the jury. As this opinion indicates, we believe that the jury's resolution of the responsibility issue is in the final analysis always predicated upon the community sense of justice and it is preferable to be forthright about the basis of that decision.

delegates the issue of criminal responsibility to the jury, thus precluding possible usurpation of the ultimate decision by the expert witnesses. Under the test we have adopted, the jury's attention is appropriately focused upon the legal and moral aspects of responsibility because it must evaluate the defendant's blameworthiness in light of prevailing community standards. Far from setting the jury at large, as in the majority Model Penal Code test the defendant must demonstrate a certain form of incapacity. That is, the jury must find that a mental disease or defect caused a substantial impairment of the defendant's capacity to appreciate the wrongfulness of his act or to conform his conduct to legal requirements. Our new test emphasizes that the degree of "substantial" impairment required is essentially a legal rather than a medical question. Where formerly under *M'Naghten* total incapacity was necessary for exculpation, the new standard allows the jury to find that incapacity less than total is sufficient. Because impairment is a matter of degree, the precise degree demanded is necessarily governed by the community sense of justice as represented by the trier of fact.

Several other components of our new test require elucidation. Our test consciously employs the more expansive term "appreciate" rather than "know." Implicit in this choice is the recognition that mere theoretical awareness that a certain course of conduct is wrong, when divorced from appreciation or understanding of the moral or legal impact of behavior, is of little import. *See United States* v. *Freeman,* 357 F.2d at 623. A significant difference from our former rule is inclusion in the new test of the concept that a defendant is not criminally responsible if he lacked substantial capacity to conform his conduct to the requirements of law. As we noted at the outset, our law assumes that a normal individual has the capacity to control his behavior; should an individual manifest free will in the commission of a criminal act, he must be held responsible for that conduct. Mental illness, however, can effectively destroy an individual's capacity for choice and impair behavioral controls.

The drafters of the Model Penal Code left to each jurisdiction a choice between the terms "wrongfulness" and "criminality." We prefer the word "wrongfulness" because we believe that a person who, knowing an act to be criminal, committed it because of a delusion that the act was morally justified, should not be automatically foreclosed from raising the defense of lack of criminal responsibility.[9]

The second paragraph of our test is designed to exclude from the concept of "mental disease or defect" the so-called psychopathic or sociopathic personality. *See* Model Penal Code, §4.01, Comment at 160, (Tent. Draft. No. 4, 1955). We have included this language in our test to make clear that mere recidivism alone does not justify acquittal. *See United States* v. *Freeman*, 357 F.2d at 625; *Bethea* v. *United States*, 365 A.2d at 80-81. We recognize that this paragraph has been the source of considerable controversy. *See, e.g., Wade* v. *United States*, 426 F.2d 64, 72-73 (9th Cir. 1970); United States v. *Smith*, 404 F.2d at 727, n.8; Diamond, *From M'Naughten to Currens, and Beyond*, 50 Calif. L. Rev. 189, 194 (1962). Nevertheless, we believe that its inclusion in our test is necessary to minimize the likelihood of the improper exculpation of defendants who are free of mental disease but who knowingly and deliberately pursue a life of crime.[10]

## V

As we have emphasized previously, preserving the respective provinces of the jury and experts is an important concern. Consonant with modern medical understanding,

---

[9]Seventeen states have elected the term "wrongfulness": Alaska, Connecticut, Delaware, Hawaii, Idaho, Indiana, Maine, Michigan, Missouri, New York, Ohio, Tennessee, Texas, Utah, Wyoming, West Virginia, and Wisconsin. For citations see note 6 *supra.* The D.C., 2d, 5th, 6th, 7th, 8th and 9th Circuit Courts of Appeals have held likewise. For citations see note 7 *supra.*

[10]Seventeen states have included this exclusionary paragraph as part of their standard: Alaska, Arkansas, Connecticut, Hawaii, Illinois, Indiana, Maine, Maryland, Missouri, Montana, Oregon, Tennessee, Texas, Utah, Vermont, Wisconsin, and Wyoming. For citations see note 6 *supra.* The federal courts of appeals are nearly evenly divided on this issue.

our test is intended to allow the psychiatrist to place before the jury all of the relevant information that is must consider in reaching its decision. We adhere to Dean Wigmore's statement that when criminal responsibility is in issue, *"any and all conduct* of the person is admissible in evidence."* 2 Wigmore, *Evidence* §228 (1940). Nevertheless, the charge to the jury must include unambiguous instructions stressing that regardless of the nature and extent of the experts' testimony, the issue of exculpation remains at all times a legal and not a medical question. In determining the issue of responsibility the jury has two important tasks. First, it must measure the extent to which the defendant's mental and emotional processes were impaired at the time of the unlawful conduct. The answer to that inquiry is a difficult and elusive one, but no more so than numerous other facts that a jury must find in a criminal trial. Second, the jury must assess that impairment in light of community standards of blameworthiness. The jury's unique qualifications for making that determination justify our unusual deference to the jury's resolution of the issue of responsibility. *See United States* v. *Eichberg,* 439 F.2d 620, 624-25 (D.C. Cir. 1971) (Bazelton, C.J., concurring & dissenting). For it has been stated that the essential feature of a jury "lies in the interposition between the accused and his accuser of the commonsense judgment of a group of laymen, and in the community participation and shared responsibility that results from that group's determination of guilt or innocence." *Williams* v. *Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446, 460 (1970). Therefore, the charge should leave no doubt that it is for the jury to determine: 1) the existence of a cognizable mental disease or defect, 2) whether such a disability resulted in a substantial impairment at the time of the unlawful conduct of the accused's capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law, and consequently, 3) whether there existed a sufficient relationship between the mental abnormality and the condemned behavior to warrant the

conclusion that the defendant cannot justly be held responsible for his acts.

## VI

So there will be no misunderstanding of the thrust of this opinion, mention should be made of the treatment to be afforded individuals found lacking criminal responsibility due to a mental illness under the test we have adopted. Unquestionably the security of the community must be the paramount interest. Society withholds criminal sanctions out of a sense of compassion and understanding when the defendant is found to lack capacity. It would be an intolerable situation if those suffering from a mental disease or defect of such a nature as to relieve them from criminal responsibility were to be released to continue to pose a threat to life and property. The General Laws provide that a person found not guilty because he was "insane"[11] at the time of the commission of a crime shall be committed to the Director of the State Department of Mental Health for observation. At a subsequent judicial hearing if he is found to be dangerous, the person must be committed to a public institution for care and treatment. G.L. 1956 (1968 Reenactment) §26-4-4. This procedure insures society's protection and affords the incompetent criminal offender necessary medical attention.

Our test as enunciated in this opinion shall apply to all trials commenced after the date of this opinion. The defendant in the instant case is entitled to a new trial solely on the issue of criminal responsibility.

The defendant's appeal is sustained and the case is remanded to the Superior Court for a new trial in accordance with the opinions expressed herein.

---

[11]We have previously expressed our preference for the phrase "lack of criminal responsibility due to a mental illness." *See* note 1 *supra*. We wish to make it clear that for purposes of G.L. 1956 (1968 Reenactment) §26-4-4 a person shall be considered "insane" if he is found not guilty by reason of lack of criminal responsibility under the test we have enunciated in this opinion.

*Dennis J. Roberts II,* Attorney General, *Nancy Marks Rahmes,* Special Assistant Attorney General, *E. Martin Stutchfield,* Special Assistant Attorney General, for plaintiff.

*Cappuccio & Cappuccio, Frank S. Cappuccio, William F. Reilly,* Public Defender, *Barbara Hurst,* Chief Appellate Attorney, *Lise J. Gescheidt,* Assistant Public Defender – Amicus Curiae, for defendant.