[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION TRAVEL OF THE CASE
On May 9, 2002, the Defendant Anthony Tavares (Tavares) was indicted by the Providence County Grand Jury for the murder of Glenn Hayes (Hayes) on November 9, 2001. A second count of said indictment charged the Defendant on that same date with eluding the police.
At arraignment, Mr. Tavares entered a plea of not guilty. However, on October 11, 2002, pursuant to Rule 12(c)(1) of the Superior Court Rules of Criminal Procedure, the Defendant, in timely fashion, through counsel filed his notice of intention to rely on the defense of insanity.
Consistent with their respective obligations under Super. R. Crim. P. Rule 12(c)(1), the Attorney General and the Defendant provided each other with the names of witnesses they would call on the insanity issue.
At trial, the principal and only witnesses regarding Defendant's insanity defense were Ronald Mark Stewart, M.D., a practicing psychiatrist in Rhode Island, for the Defendant; and Howard V. Zonona, M.D., a professor of psychiatry at Yale University, New Haven, Connecticut, testified for the State.
Prior to trial, the parties submitted the exhibits upon which they intended to rely during the proceeding. The State's exhibits are numbered 1 through 13, the Defendant's were lettered A through R. By stipulation all exhibits were marked full except State's Exhibit 12 and Defendant's Exhibit O.
Just before trial the Defendant, Anthony Tavares, filed a written waiver of trial by jury in accordance with R.I.G.L. § 12-17-3 and Super. R. Crim. P. Rule 23(a). After due examination of the Defendant and his counsel, the Court approved the waiver and trial commenced.
 THE EVIDENCE
In its case in chief, the prosecution presented three fact witnesses: Victor Moniz (Moniz), a registered nurse; Carmine Giarusso, a retired police detective of the Cranston Police Department, and Patrolman Justin Dutra, a Cranston police officer.
In brief, Victor Moniz testified that on November 9, 2001 he was employed by Johnston Mental Health Services (JMHS) as a psychiatric nurse on a motile treatment team. His primary function was to service those patients suffering from psychiatric illness residing in the community. On November 9, 2001, Mr. Moniz was working with Mr. Glenn Hayes, also employed by JMHS as a substance abuse specialist. On that fateful day, one of their assignments was to contact Mr. Tavares and arrange the delivery of his medication. Anthony Tavares had been treated for some time by JMHS and Mr. Moniz and Mr. Hayes were well-known to him since, as the evidence demonstrates, he had numerous contacts with them before November 9, 2001.
Mr. Moniz testified that it was the protocol of JMHS that before making a home visit that the patient be called "to see how he is doing" and to inform him of the intent to deliver the medication, if needed. Abiding by the protocol, Moniz called the Defendant at his residence and received his approval to the visit, with the admonition, however, "to come soon because he had something to do." Mr. Moniz and Mr. Hayes arrived at the Defendant's home at 2045 Broad Street, Cranston, Rhode Island, also known as Evergreen Apartments, at approximately 5:00 P.M. and after ringing the bell, they were met at the door by the Defendant. At that time according to Moniz, Glenn Hayes was standing beside him, but he did the talking. He asked the Defendant how he was doing and Tavares responded that he was looking for a job and a new apartment. Mr. Moniz then advised that he brought his medications for him which Tavares accepted, commenting however that he only takes his medication when he feel he needs it. The Defendant then asked Moniz and Hayes if they wished to go up to his apartment to talk. Mr. Moniz stated he was "a little leery" and looked at Mr. Hayes who said he was "okay with it." According to Moniz, the three of them went up the stairs and into the apartment. They sat on what he described as a futon couch which was low to the floor. At this point, Moniz stated the Defendant's tone of voice changed and became aggressive. Tavares wanted to know if they had his money, and when they explained that they did not, he asked them if they would lend him some money. When they answered that they could not, the Defendant asked "Well, how much money do you guys have on you?" Moniz, uneasily, told him all he had was about a dollar and a quarter. Glenn Hayes, according to Moniz, made a similar response.
Victor Moniz then decided to shift the focus of the conversation to other areas such as the Defendant's search for a new apartment. However, it was during this portion of the discussion that Tavares's side of the conversation became bizarre. He asked Hayes and Moniz if they would worship Satan with home. Their answer was that they didn't worship Satan. He then asked Hayes if he prayed. Hayes started to reply when the Defendant's mother entered the room and politely chastised her son for smoking in the house[1] and when she suggested he go outside to smoke; he refused and became loud and abrasive. Moniz and Hayes attempted to becalm the Defendant and to some extent were successful. At this time, Glenn Hayes apparently decided it was time to leave indicating to the Defendant that he was doing well but because of other commitments Moniz and he had to go. Glenn Hayes rose to his feet. Moniz, from his position on the couch, started to rise when he heard the Defendant in a loud voice state "Where the fuck are you going?" Moniz testified that he then heard what sounded like a shuffling or stumbling of feet and in the process of arising from the couch, he looked up and saw a knife flashing — he followed its path and saw it strike Glenn in the head.[2] Moniz attempted to grab Tavares' arm, but the Defendant punched him causing him to fall backward into the wall. As Moniz tried to recover his balance, the Defendant's mother, Mary Anne Votolato, rushed into the room screaming: "Anthony, Anthony what have you done?" It appeared to Moniz that the Defendant was startled and distracted by his mother's voice giving him the opportunity to run down the stairs out of the apartment. Once outside, Moniz went to a neighboring home and persuaded a female occupant to call 911.
It is patently clear from the vivid and compelling testimony of Victor Moniz that the stabbing and murder of Glenn Hayes by the Defendant was entirely without provocation.
The State's next witness was Carmine Giarusso, a former Cranston police detective — now retired. On November 9, 2001, he was on duty at the Cranston police Department. His assignment was to take statements from Mary Anne Votolato, the Defendant's mother; Justin Votolato, brother to the Defendant, and Natalie Papa, Justin's girlfriend. All three were in the apartment when the tragic event occurred. The essence of Giarusso's testimony was that at Justin's suggestion several calls were made by Justin to the Defendant's cell phone in an attempt to exhort him to surrender. Mrs. Votolato also joined in this effort, but the Defendant resisted.
The State's last fact witness was Patrolman Justin Dutra of the Cranston Police Department. His assignment was to stake out the Defendant's apartment at 2045 Broad Street, Cranston, in the event Tavares returned. At 7:26 a.m. on November 10, 2001, Dutra saw the Defendant's Cadillac heading south on Broad Street towards the apartment. Officer Dutra followed and a lengthy chase through Cranston and Providence streets ensured. The Defendant was driving erratically and at varying rates of speed. The chase reached its climax when Dutra, with assistance from members of the Providence and State Police Departments, forced the Defendant off the road on Route 95 North and placed him under arrest.
After Officer Dutra's testimony, the State rested its case in chief.
 THE LAW
In 1979, the Rhode Island Supreme Court, in the matter of State v.Johnson, 121 R.I. 254, 399 A.2d 469 (1979), adopted the model penal code test in determining criminal responsibility rejecting the long adhered toM'Naghten "right and wrong" test, so-called. See M'Naghten, 8 Eng. Rep. 718 (1843); see also State v. Quigley, 26 R.I. 263 (1904). The model penal code test as adopted by the Johnson Court states:
 "A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible.
 The terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." State v. Johnson, supra, 267.
 STANDARD AND BURDEN OF PROOF
Once a defendant raises the affirmative defense of insanity, the burden shifts to him to prove his insanity by a fair preponderance of the evidence. The state still has the burden of proving all the elements of murder beyond a reasonable doubt. This is constitutionally permissible.State v. Page, 104 R.I. 323, 330 (1968); State v. Jefferds, 91 R.I. 214,218 (1960); State v. Quigley, 26 R.I. 263, 273 (1904); State v. Capalbo,433 A.2d 242 (1981). See also Patterson v. New York, 432 U.S. 197
(1977). Defendant's counsel, however, urges this Court to add to the State's burden of proof by requiring it to disprove the insanity defense by proof beyond a reasonable doubt. This same request was spurned by our Supreme Court in State v. Capalbo, supra. See also State v. Barrett,768 A.2d 929, 947 (R.I. 2001). To impose this additional requirement to the State's already heavy burden is repugnant to principles promulgated in Capalbo, supra, is violative of the law and would lead this Court to manifest error, and is rejected.
 THE EXPERTS
At trial, both the State and Defendant produced expert psychiatric testimony. The resolution of this case rests in their testimony. Howard Zonona, M.D., Professor of Psychiatric Medicine at Yale University testified for the State. Dr. Zonona's credentials are stellar and to read his entire curriculum vitae into the record would take more time than this Court has. It is nevertheless a full exhibit and available to all. Suffice it to say, Dr. Zonona's experience is immense and impressive. He was a convincing and credible witness.
As a witness for the Defendant, Dr. Stewart is a familiar figure in the courts of this state and has been recognized as an expert in psychiatry in our courts at all levels.
Both witnesses took this Court through a tortuous journey of the Defendant's world of mental health experiences and treatments from the time of his adolescence to the present. Both witnesses referenced his hospitalization, his delusions, hallucinations, his sometimes aggressive behavior, his preoccupation with religious and sexual thoughts and delusions and his numerous medications throughout his life. After analysis of the Defendant's long medical and psychiatric history, both experts concurred. But Dr. Zonona put it best in his report at page 16:
 "In sum, I believe that Mr. Tavares suffers from a severe mental disorder of psychotic proportions that interferes with his reasoning, judgment, and control to a degree that substantially impairs his capacity to appreciate the wrongfulness of his behavior, as well as impairing his ability to conform his behavior to the requirements of the law. I understand that the legal determination of his sanity is one for the finder of fact to make in Rhode Island"
The Court accepts the conclusions and opinions of Drs. Zonona and Stewart. Thus, the Court makes the following findings of fact:
1.) That on November 9, 2001, the time he murdered Glenn Hayes, the Defendant was suffering from the existence of a cognizable mental disease or defect, schizophrenia;
2.) That said disease or defect resulted in a substantial impairment of Mr. Tavares. At the time of his unlawful conduct, he lacked the capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law; and,
3.) That there existed a sufficient relationship between the mental defect or disease (schizophrenia) and the condemned behavior (murder of Glenn Hayes) to warrant the conclusion that Mr. Tavares cannot justly be held responsible for his acts.
 CONCLUSION
The Court, therefore, is constrained to acquit the Defendant by reason of insanity on both counts, finding that the Defendant has sustained his burden of proof of his insanity by a fair preponderance of the evidence.
[1] Moniz testified that when the Defendant's mother (Mary Anne Votolato) entered the room he was smoking and "flick[ing] ashes" on the floor.
[2] The autopsy report indicated that the knife wound was to the left side of Hayes' forehead.