STATE

v.

Robert COLLAZO.

No. 2007–108–C.A.

Supreme Court of Rhode Island.

April 3, 2009.

Jane M. McSoley, Providence, for Plaintiff.

Janice M. Weisfeld, Providence, for Defendant.

Present: GOLDBERG, Acting C.J., FLAHERTY, SUTTELL, ROBINSON, JJ., and WILLIAMS, C.J. (ret.).

## OPINION

Chief Justice WILLIAMS (ret.), for the Court.

The defendant, Robert Collazo (defendant), appeals his conviction for first-degree murder, contending that the trial justice erred in finding that he was not legally insane when he stabbed and beat to death his friend, Brian Araujo (Araujo). For the reasons hereinafter set forth, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

On the afternoon of March 10, 2002, defendant appeared outside of Araujo's home in Central Falls, Rhode Island. The defendant told Araujo's father that it was very important that he speak with Araujo, who was sleeping at the time. The defendant proceeded to bang on Araujo's bedroom window while Araujo's father went to wake him. Araujo invited defendant inside the house, and after a short conversation in Araujo's bedroom, the two men agreed to walk to nearby Jenks Park to smoke marijuana. Before they left the house, defendant pocketed a steak knife from Araujo's kitchen.

Approximately one hour later, near the top of the stairs leading up to Cogswell Tower in Jenks Park, defendant stabbed Araujo twice in the chest, using the stolen knife. When Araujo attempted to run, defendant pushed him down two sets of stairs. In front of multiple witnesses, defendant kicked and stomped on Araujo's head, chest, and throat. As children ran by the scene, defendant yelled to them, "come on, take a look, see what happens."

As Araujo lay dying from his wounds, defendant walked back up to the tower, requested a lighter from a witness, and proceeded to smoke a cigarette. By the time officers of the Central Falls Police Department and emergency medical personnel responded to the scene, defendant had returned to the bottom of the stairs and was leaning against a railing within several feet of Araujo's body. Araujo's wallet and credit cards were strewn on the ground near his body. When questioned by a police officer who had noticed blood on defendant's shoes, clothing, and hands, defendant responded that Araujo was his friend and that he had been trying to help him. The police, however, took defendant into custody after a witness had identified him as the man who had stomped on and kicked Araujo. A police officer who conducted a custodial search found Araujo's ATM card in defendant's front shirt pock-

et. Araujo was pronounced dead shortly thereafter.

At the Central Falls police station, officers observed defendant's demeanor as calm and cooperative. He waived his *Miranda*[1] rights and voluntarily agreed to an interview, which was videotaped. For approximately the first hour of the one hour and seventeen minute interview, defendant repeatedly denied having harmed Araujo, instead providing an alibi for the murder. The defendant explained that he and Araujo had arrived at the park, planning to smoke marijuana, but that Araujo's lighter was not working, so defendant had volunteered to walk to a nearby corner store to get matches. According to defendant, he had not even left the park when he heard Araujo shout for help; he turned around to see Araujo lying on the ground stabbed, battered, and gasping for air. The defendant claimed that he fell over Araujo's body as he ran to help him and that he also called to passersby for help. He speculated that Araujo had been the victim of a robbery, and he explained that he took Araujo's ATM card for safekeeping after finding it on the ground near Araujo's body. Although defendant offered that he suffered from schizophrenia and that in the past he had heard voices and had blacked out, he emphatically denied having blacked out that day.

The defendant abruptly and dramatically changed his story, however, after detectives confronted him about the eyewitness accounts and physical evidence contradicting his alibi. In this latter account to police, he boasted of stabbing and beating Araujo, who he referred to as "evil" and "Satan's incarnate." He explained that Araujo was evil because "he existed" and he alleged, without elaboration, that Araujo had raped at least one of defendant's girlfriends, though he acknowledged that it had been a while since he had had a girlfriend. He asserted that he wanted to watch Araujo die and that he wanted him to suffer as much as possible before he died. The defendant also expressed regret that the murder was not televised and that more people, including his own family, were not present to witness the murder. Finally, defendant claimed that he had planned the murder years in advance and that he decided to kill Araujo on a Sunday because "It's the day that God rested."

On August 30, 2002, a grand jury indicted defendant for Araujo's murder. The defendant subsequently filed a notice of his intent to rely on the insanity defense and waived his right to a jury trial. After defendant was found competent to stand trial,[2] a jury-waived trial commenced on March 23, 2006. At trial, defendant did not challenge the state's evidence indicating that he had murdered Araujo, nor did he produce any of his own evidence contradicting that of the state. Rather, defendant relied on the expert-witness testimony and written report of a board-certified psychiatrist, Ronald Stewart, M.D., to support his contention that he lacked criminal responsibility due to a mental illness.

Doctor Stewart had evaluated defendant on several occasions after the murder and also had reviewed his medical records and the evidence in the case. During the trial, he recounted defendant's well-documented history of acute and chronic mental illness, which included numerous hospitalizations

---

**1.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**2.** Psychiatrists performed six different pretrial competency evaluations on defendant, three of which determined him to be incompetent and three of which, including the last, concluded that he was competent to stand trial. The Superior Court, however, never made a finding that defendant was incompetent to stand trial.

for psychotic and suicidal behavior.[3] The defendant also had received Social Security disability payments as a result of his mental illness. Doctor Stewart further detailed defendant's history of noncompliance with his prescribed medication and treatment, and his frequent self-medication with drugs and alcohol, which Dr. Stewart believed exacerbated his mental illness. He testified that defendant exhibited the following symptoms: paranoia, hyper-religiosity, disorganized thought, mood swings, delusions, and auditory hallucinations. Based on these symptoms, Dr. Stewart diagnosed defendant as having schizoaffective disorder, bipolar disorder, psychotic disorder, substance-induced psychotic disorder, and antisocial personality disorder. Citing defendant's confession to the police and the lack of any other clear motive for the crime, Dr. Stewart believed that at the time of the murder defendant suffered from the paranoid delusion that he was an agent of God sent to eradicate evil by killing Araujo. Doctor Stewart concluded that this delusion prevented defendant from being able to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of law.

To rebut Dr. Stewart's testimony, the state produced its own board-certified psychiatrist and expert witness, Robert Cserr, M.D., who also had evaluated defendant after the murder and had reviewed his medical records and other evidence in this case. Though he did not dispute Dr. Stewart's account of defendant's history of mental illness and largely concurred with his diagnosis,[4] Dr. Cserr disagreed with him over the role that the illness had played in the murder. Doctor Cserr distinguished between defendant's psychotic disorders, which manifested themselves in episodes like the naked joyride,[5] in which defendant was floridly and uncontrollably delusional, and defendant's personality or character disorder, which Dr. Cserr described as a failure of maturity characterized by antisocial behavior. Citing the calmness and deliberateness with which defendant had planned and executed the murder and the degree to which he clearly recollected the details of the crime, Dr. Cserr believed that defendant had not been seized by a psychotic paranoid delusion at the time of the murder.[6] Rather, Dr. Cserr maintained that the murder was the product of anger that defendant had failed to control due to his personality disorder. He hypothesized that the anger derived from a sexual relationship between defendant and Araujo, which the latter had initiated, and which defendant had revealed to Dr. Cserr as having troubled him. Doctor Cserr concluded that although defendant did indeed suffer from a mental illness, it had not substantially impaired his capacity to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of law.

In a rescript opinion issued on November 1, 2006, the trial justice rejected defen-

---

3. In one particularly vivid episode in September 2000, defendant, while naked, stole an idling convertible and drove wildly through the streets of Central Falls, going the wrong way up one-way roads and careening off parked cars. He eventually crashed in front of a fire station and had to be physically restrained after assaulting two firefighters who had attempted to help him.

4. Doctor Robert Cserr diagnosed defendant as suffering from schizoaffective disorder, bipo-

lar-type with depressive features, and personality disorder with antisocial, narcissistic, and borderline features.

5. *See* footnote 3, *supra*.

6. In contrast, Dr. Stewart could not explain why defendant had not attacked the police when they responded to the scene, as he had done to firefighters following his joyride in 2000. *See* footnote 3, *supra*.

dant's insanity defense and found him guilty of first-degree murder. He found Dr. Cserr's testimony to be more reliable and credible than that of Dr. Stewart. Although he acknowledged defendant's well-documented history of mental illness, the trial justice determined that it had not substantially impaired his capacity to appreciate the wrongfulness of his actions or to conform his conduct to the requirements of law. The trial justice subsequently sentenced defendant to the statutorily mandated term of life imprisonment,[7] and defendant timely appealed.

## II

## Analysis

On appeal, defendant challenges only the trial justice's determination that he was not legally insane when he murdered Araujo. He argues that the trial justice erred by believing the testimony of Dr. Cserr over that of Dr. Stewart, and he contends that while the evidence may have shown that defendant appreciated the criminality of his act, it also compelled the conclusion that he lacked the requisite capacity to appreciate the wrongfulness of his conduct or conform it to law when he murdered Araujo.

### A

### Standard of Review

■ Whether a defendant lacks criminal responsibility due to a mental illness is a question of fact, the determination of which we give considerable deference to the fact-finder. *See State v. Barrett,* 768 A.2d 929, 938 (R.I.2001) ("[T]he insanity defense, place[s] great burdens on the trier of fact. * * * [It] ask[s] the factfinder to look into the psyche of the defendant

and discern its innermost workings. It is a most difficult assignment. As an appellate court with only the cold, lifeless record to guide us, we naturally defer to the trier of fact who heard the witness' tone of voice, saw their facial expressions and presumably caught the trial's subtleties—all of which may be lost in the written word.") (quoting *Commonwealth v. Cain,* 349 Pa.Super. 500, 503 A.2d 959, 971 (1986)); *State v. Johnson,* 121 R.I. 254, 270, 399 A.2d 469, 478 (1979) ("In determining the issue of responsibility the jury has two important tasks. First, it must measure the extent to which the defendant's mental and emotional processes were impaired at the time of the unlawful conduct. The answer to that inquiry is a difficult and elusive one, but no more so than numerous other facts that a jury must find in a criminal trial. Second, the jury must assess that impairment in light of community standards of blameworthiness. The jury's unique qualifications for making that determination justify our unusual deference to the jury's resolution of the issue of responsibility.").

■ Accordingly, we will not disturb a trial justice's findings of fact in a jury-waived trial "unless they are clearly wrong or the trial justice misconceived or overlooked material evidence on a controlling issue." *State v. LaCroix,* 911 A.2d 674, 679 (R.I.2006) (applying this standard of review in upholding the trial justice's finding that the defendant had not suffered from diminished capacity when he committed the charged offense). In fact, we may decide to uphold a trial justice's finding even if we would have found differently had we been in the trial justice's position.

---

7. "Every person guilty of murder in the first degree shall be imprisoned for life." G.L. 1956 § 11–23–2.

*See State v. Gillespie*, 960 A.2d 969, 980 (R.I.2008).

## B

### Defendant's Criminal Responsibility for the Murder of Brian Araujo

In *Johnson*, 121 R.I. at 267, 399 A.2d at 476, this Court adopted the American Law Institute's Model Penal Code test for legal insanity. We held as follows:

"A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible.

"The terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct." [8] *Johnson*, 121 R.I. at 267, 399 A.2d at 476.

This Court specifically chose to use the word "wrongfulness" over "criminality" in our definition of legal insanity because "we believe that a person who, knowing an act to be criminal, committed it because of a delusion that the act was morally justified, should not be automatically foreclosed from raising the defense of lack of criminal responsibility." *Johnson*, 121 R.I. at 269, 399 A.2d at 477.

■ Although the state bears the burden of proving all the elements of murder beyond a reasonable doubt, a defendant who raises the insanity defense bears the burden of proving his or her insanity by a preponderance of the evidence. *State v. Smith*, 512 A.2d 818, 822 (R.I.1986); *State v. Capalbo*, 433 A.2d 242, 245 (R.I.1981).[9] A defendant not only must prove that he "suffered from this defect *at the time of the offense*," but also that he suffered from this defect to such a degree that he cannot "justly be held responsible" for the crime. *State v. Gardner*, 616 A.2d 1124, 1128–29 (R.I.1992) (emphasis added) (quoting *Johnson*, 121 R.I. at 270–71, 399 A.2d at 478). Furthermore, "[t]he fact that a defendant engaged in unusual behavior or made bizarre or delusional statements does not compel a finding of insanity, and a defendant may suffer from a mental illness without being legally insane." *Barrett*, 768 A.2d at 938 (quoting *People v. Gilmore*, 273 Ill.App.3d 996, 210 Ill.Dec. 471, 653 N.E.2d 58, 61 (1995)).

■ In evaluating a defendant's claim of insanity, the fact-finder considers expert testimony as well as the defendant's actions preceding, during, and after the crime. *See Barrett*, 768 A.2d at 936–37. We have distinguished the role of the expert psychiatrist from that of the fact-finder in the legal insanity determination, explaining that:

"Ideally, psychiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. But once this information is disclosed, it is society

---

8. "The second paragraph of our test is designed to exclude from the concept of 'mental disease or defect' the so-called psychopathic or sociopathic personality." *State v. Johnson*, 121 R.I. 254, 269, 399 A.2d 469, 477 (1979).

9. The United States Supreme Court has held that placing the burden of proving insanity on a defendant does not violate the Federal Constitution. *State v. Smith*, 512 A.2d 818, 823 (R.I.1986) (citing *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) and *Leland v. Oregon*, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952)).

as a whole, represented by judge or jury, which decides whether a [person] with the characteristics described should or should not be held accountable for his acts." *Gardner*, 616 A.2d at 1127 (quoting *Johnson*, 121 R.I. at 266–67, 399 A.2d at 476).

There is no indication in the case at bar that the trial justice misconceived or overlooked material evidence in finding defendant to be criminally responsible for Araujo's murder. As his written decision demonstrates, the trial justice considered each expert witness's testimony. He accepted Dr. Stewart's account of defendant's well-documented history of mental illness, and he noted Dr. Stewart's opinion that defendant had been incapable of appreciating the wrongfulness of his conduct due to his belief that the murder was morally correct. He also noted what he considered to be Dr. Stewart's unsubstantiated testimony that a person can be in a psychotic state, yet still appear calm and lucid.

The trial justice, however, found Dr. Cserr's testimony to be more reliable and credible than that of Dr. Stewart,[10] and accordingly afforded it more weight. He agreed with Dr. Cserr's assessment that the deliberateness with which defendant had obtained the murder weapon, along with defendant's clear recollection of the events of the day in question, and his calm and cooperative demeanor with the police following the murder, taken together, indicated that he had not killed Araujo in a psychotic delusion. Rather, the evidence showed a carefully orchestrated ambush in which defendant had lured Araujo to the park under the pretext of smoking marijuana. As the trial justice pointed out, his finding was consistent with our decision in

*Barrett*, in which we upheld a fact-finder's rejection of a diminished-capacity defense based largely upon the methodical manner in which the defendant had cleaned the crime scene and had awaited the arrival of the police. *See Barrett*, 768 A.2d at 934, 937, 938 (where, after shooting his victim, the defendant discarded marijuana, unloaded his gun and placed it in a visible area, and removed his outer shirt so that police would not think he was armed).

The trial justice further concurred with Dr. Cserr's opinion that defendant's wherewithal to concoct an alibi for the murder and his repeated denial of wrongdoing was evidence that he understood the wrongful nature of the act. To make the scene look like a botched robbery, defendant had removed Araujo's wallet from his person and had taken his ATM card for "safekeeping." He also suggested that the blood on his clothes was the product of his attempt to save Araujo's life, further indicating that he had appreciated the difference between right and wrong. The trial justice emphasized that defendant did not confess until after detectives had confronted him with the overwhelming evidence of his involvement in the crime. Finally, as the trial justice explained, Dr. Cserr's testimony was consistent with the physical evidence, eyewitness testimony, and videotaped confession submitted at trial.

In light of our considerable deference to the fact-finder, and because the trial justice did not overlook or misconceive material evidence, we conclude that he did not commit reversible error in finding that the defendant failed to prove his legal insanity by a preponderance of the evidence.

### Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The

---

10. The trial transcript reveals that the trial justice expressed concern at the fact that Dr. Stewart chose to believe some of the things that defendant had told him, while disbelieving other things that he had said.

record shall be remanded to the Superior
Court.