Benedetto A. CERILLI

v.

NEWPORT OFFSHORE, LTD.

Allan M. SHINE, Receiver of Newport
Harborfront Investors

v.

NEWPORT OFFSHORE, LTD.

No. 91–414–A.

Supreme Court of Rhode Island.

July 3, 1992.

John Voorhees, Richard J. Welch, Donald
P. Rothschild and Amelia E. Edwards, Til-
linghast Collins & Graham, Providence, for
plaintiff.

Richard G. Galli, Barbara Harris, Prov-
idence, for defendant Moneta Capital Corp.

Justin T. Shay, Richard S. Mittleman,
Cameron & Mittleman, Providence, for de-
fendant Harold I. Schein.

## OPINION

WEISBERGER, Justice.

This case comes before us on appeals by
PC & J Contracting Co., Inc., and Harold L.
Schein from rulings made by a justice of

the Superior Court in respect to two controversies arising in the course of administering the above-entitled receivership proceedings. We affirm the rulings of the trial justice. The facts underlying the subject controversies insofar as pertinent to the appeals will be set forth under the heading applicable to each controversy.

I

## THE PURCHASE OF ASSETS BY PC & J CONTRACTING CO., INC.

PC & J Contracting Co., Inc. (PC & J), made an offer to the coreceivers, Allan M. Shine and Milton Stanzler, to purchase all the assets of the receivership including assets subject to security interests. The offer that was made and accepted by the coreceivers and approved by the Superior Court provided in part as follows:

(After offering to purchase all the right, title, and interest held by the receivers free and clear of any and all liens and encumbrances in and to all of the assets, the offer then referred specifically to security interests.)

"3. Upon the information and belief of [the] Purchaser, the following are all creditors who hold *security interests and/or liens* in any or all of the *Acquired Assets* with the claimed amounts of the balance of the indebtedness secured by the Acquired Assets:

| | |
|---|---|
| "Fleet National Bank | $ 490,000–/– |
| Wallace Capital Corporation | 505,000–/– |
| Moneta Capital Corporation | 853,000–/– |
| Harold Schein | 132,000–/– |
| Ante Stipich | 110,000–/– |
| Internal Revenue Service | 604,000–/– |
| Total | $2,694,000–/– |

"For purposes hereof, '*Secured Indebtedness*' shall be defined as: (a) the aggregate of the amounts due Fleet National Bank, Wallace Capital Corporation, Moneta Capital Corporation, Harold Schein, Ante Stipich and Internal Revenue Service which the Court determines are secured by the assets of Respondent [Newport Offshore, Ltd.] corporation * * * .

"4. In consideration for the Acquired Assets, [the] Purchaser agrees to: (a) pay to you an amount equal to the outstanding balance of the *Secured Indebtedness* as of the date of closing * * *. For purposes of this paragraph, only the indebtedness described in the preceding paragraph shall be considered part of the *Secured Indebtedness* * * *." (Emphasis added.)

In addition to the foregoing portion of the offer, PC & J also offered to pay $995,-000 toward payment of the unsecured indebtedness of the corporation, coreceivers' fees, and certain other advances that had been made. This offer was made at a public auction and was accepted by the Superior Court on October 19, 1990.

After the offer had been accepted and approved by the court, the Superior Court justice presiding in the county of Newport scheduled a hearing on November 7, 1990, to determine the amounts due and owing to the secured creditors named in the offer. The secured creditor concerning whom this controversy arose was Moneta Capital Corporation (Moneta). The trial justice determined that as of the date of the hearing the balance of secured indebtedness owed to Moneta (exclusive of a claimed 3 percent prepayment premium) was $836,063.28. He postponed decision until a later time on the question of the prepayment premium as well as attorneys' fees claimed by Moneta.[1]

---

1. This appeal has not been challenged on the ground that it is interlocutory since further issues remain to be determined by the trial justice. Certainly the question of the revaluation

At this hearing PC & J attempted to reduce Moneta's secured claim by eliciting evidence that the value of the secured assets that included a 725–ton floating drydock, assignment of a contract with the Maritime Administration for berthing a vessel, and a Maritime Administration lease for berthing of three liquified natural gas tankers was less than the amount of the claimed balance due on two promissory notes.

The trial justice declined to receive evidence of the value of this collateral on the ground that the terms of the offer were clear and unambiguous and did not contemplate the reduction of amounts due and owing by a revaluation of the collateral. The trial justice commented as follows:

"Nowhere in paragraph 3 or paragraph 4 of the agreement is there language to indicate that there would be adjustments to be paid by * * * the valuation of the various items of collateral that are identified under the security agreements. Nowhere is it stated that will be done and nowhere could it be inferred that would be done."

PC & J argues that this ruling constituted an error of law since the terms "secured indebtedness" and "acquired assets" and "security interests and/or liens" were terms of art readily defined in the law and implicitly required the valuation of the collateral in order to determine whether Moneta was undersecured.

The coreceivers have joined in the brief filed by Moneta and take the position that the trial justice was correct in declining to reduce the amount of Moneta's claim on the basis of a revaluation of the collateral assets.

PC & J argues that the requirement of restricting a lienholder/receiver to the value of the security assets is supported by the Federal Bankruptcy Act, 11 U.S.C. § 506(a) (1989), which provides in pertinent part as follows:

"An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to set off under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim."

Moneta argues that § 506 of Title 11 of the Bankruptcy Code is not applicable and certainly not controlling in respect to a state-receivership proceeding. It argues further that the terms "security indebtedness" and "security interests and/or liens" are not defined as terms of art by the Rhode Island Commercial Code, G.L.1956 (1985 Reenactment) chapter 9 of title 6A. Nor indeed, Moneta asserts, do those sections shed any light on the disputed definition of these terms. Our examination of the pertinent Rhode Island statutes leads us to the conclusion that the terms in question are not defined by Rhode Island statutes (as contended by PC & J) and that they therefore do not constitute terms of art in the sense of PC & J's restrictive gloss. We further note that Black's Law Dictionary fails to give any definition of "secured party" or "security interest" save in the most general sense, nor do any of these nonspecific definitions support the arguments asserted by PC & J.[2]

Consequently in our opinion the trial justice considered the terms of the offer in accordance with the plain everyday meaning that would be ascribed to those terms by the coreceivers. This conclusion is in accordance with the usual rules of construction applied to contract language. Unless plain and unambiguous intent to the contrary is manifested, words used in con-

---

of collateral has an element of finality that would qualify this controversy for review on appeal. *Town of Lincoln v. Cournoyer,* 118 R.I. 644, 375 A.2d 410 (1977); *McAuslan v. McAuslan,* 34 R.I. 468, 83 A. 837 (1912).

2. "Secured party. A lender, seller or other person in whose favor there is a security interest, including a person to whom accounts or chattel paper have been sold." Black's Law Dictionary 1354 (6th ed. West 1990).

tract language are assigned their ordinary meaning. *Westinghouse Broadcasting Co. v. Dial Media, Inc.*, 122 R.I. 571, 410 A.2d 986 (1980). The trial justice considered the language clear and unambiguous. We agree with this interpretation; clear and unambiguous language set forth in a contract is controlling with respect to the parties' intent and governs the legal consequence of the contract's provisions. *See, e.g., Elias v. Youngken*, 493 A.2d 158 (R.I.1985); *Dudzik v. Leesona Corp.*, 473 A.2d 762 (R.I.1984); *Chapman v. Vendresca*, 426 A.2d 262 (R.I.1981).

In order to support a highly specialized interpretation of this offer and acceptance, PC & J engages in what may be termed an abstruse pursuit of contextual meanings not relevant to the current controversy. We are not persuaded that the offer in any way gave notice to the coreceivers or to the court of the subtle restrictions that would be placed upon the words and phrases used. Therefore, we conclude that the trial justice did not err in holding as a matter of contract interpretation that Moneta was entitled to the balance due on its indebtedness without limitation by revaluating the collateral assets.

## II

## THE *KRITER*

On May 19, 1988, Newport Offshore, Ltd. (NOL), purchased the sailing vessel *Kriter* at an auction from a U.S. Marshal. The sale had been ordered by a Federal District Court Judge to enforce a maritime lien for storage and repairs performed. The auction price was $5,000. Subsequent to the purchase, employees of NOL performed work to repair and restore the vessel.

In the spring and summer of 1990 NOL experienced severe financial difficulties. The Internal Revenue Service had threatened to close down the yard for failure to pay taxes. Faced with this grave economic peril, Benedetto A. Cerilli, Jr. (Cerilli), and William A. Hustwit (Hustwit), who were principal officers of NOL, contacted Harold L. Schein (Schein). They sought to obtain a loan from Schein in order to stave off the closing of the shipyard. Schein responded that neither he nor his investment company would be willing to make any further loans to NOL. They then began to discuss the possibility of a sale to Schein of the *Kriter*, which was at the shipyard in the process of being restored. After inspecting the vessel, Schein offered to purchase the *Kriter* for $50,000. At this point the testimony of the participants differs concerning the agreement reached by the parties. In light of this testimony the trial justice found the following facts.

Schein intended to enter into an agreement to buy the *Kriter* for $50,000 subject to a joint venture regarding the completion of repairs to the *Kriter*, the repurchase of it by NOL, Hustwit, and Cerilli; and the division of profits to be realized from the *Kriter*'s chartering or other commercial use and its eventual resale. The trial justice further found that the sale of the *Kriter* was conditioned upon the details of the joint-venture arrangement's being finalized through a written agreement to be duly executed by the parties. The joint-venture agreement as drafted provided in part as follows:

"1. At Schein's sole option, Cerilli and/or Hustwit and/or Newport agree to purchase the Kriter from Schein for the sum of Seventy-five Thousand Dollars ($75,000.00), plus any expenses incurred by Schein, within twelve (12) months from July 3, 1990. After said date, the purchase price will increase by sixteen percent (16%) per annum.

"2. Cerilli, Hustwit and Newport agree to expeditiously bring the Kriter to first class condition including, but not limited to, performing the work described in the survey dated June 6, 1988 performed by Atlantic Marine Surveyors. It is agreed that the cost of the work to be performed shall not exceed Thirty Thousand Dollars ($30,000.00).

"3. Upon completion of the said work, the parties hereto agree to make the Kriter available for chartering or other commercial use. All proceeds from said use will be paid as follows: all sums will be paid to Schein until the payment of Seventy-five Thousand Dollars ($75,-000.00) (plus interest and expenses as set forth in paragraph 1 above); next, funds

will be applied to reduce the Thirty Thousand Dollar ($30,000) cost for the work performed by Cerilli, Hustwit and Newport; next, any remaining funds will be divided one-third (1/3) to Schein, one-third (1/3) to Hustwit and one-third (1/3) to Cerilli.

"4. Simultaneously with the Kriter being available for chartering, the parties agree that the boat will be offered for sale. At such time that the Kriter is sold, the proceeds will be divided as per paragraph 3 above."

The foregoing agreement was signed by Cerilli and Schein but was never executed by Hustwit or by NOL. The trial justice found that Schein had intended to purchase the vessel but only with the further provisions to be established under the joint-venture agreement. He stated in his written decision that "[a]lthough NOL was desperate for cash, Hustwit and Cerilli would not have agreed to a sale of the Kriter without finalizing the terms of the joint venture agreement which would preserve NOL's, Hustwit's and/or Cerilli's participation in a further financial return on the Kriter." The trial justice further found that a purported bill of sale that was given to Schein by Cerilli was not approved by Hustwit or the corporation and that corporate ratification of the transaction did not occur. In evaluating the credibility of the testimony given by Schein and Cerilli, the trial justice took particular note of the fact that Schein did not inform the receivers or PC & J (the successful bidder for the corporate assets) that he claimed ownership of the *Kriter* until after the auction was completed. Schein had been present at the shipyard along with the receivers on September 17, 1990, but did not claim any interest in the vessel. The trial justice was not impressed by Schein's explanation that he wanted to avoid embarrassment in the eyes of his accountant for having embarked upon such a transaction. The trial justice specifically found that the claim of ownership was "intentionally withheld by Schein and his agents," and although presented with opportunities, they did nothing prior to or on October 19, 1990, to assert any claim of ownership of the vessel either to the receivers or to PC & J.

The trial justice determined that a transfer of title to the vessel never occurred and that NOL "did in fact own the Kriter and that said property was properly transferred to PC & J when it closed on the purchase of NOL's assets." Consequently he denied the motion to reclaim the vessel as the property of Schein.

The standard of review of the findings of fact of a trial justice sitting without the intervention of a jury is extremely deferential in this jurisdiction. We shall not disturb the findings of the trial justice unless it is established that he or she misconceived or overlooked relevant and material evidence or was otherwise clearly wrong. *Pereira v. Tellier,* 583 A.2d 523 (R.I.1990); *Green v. Green,* 559 A.2d 1047 (R.I.1989); *Smith v. Boyd,* 553 A.2d 131 (R.I.1989); *Lavey v. Lavey,* 551 A.2d 692 (R.I.1988). The determination by a trial justice of mixed questions of law and fact is entitled to the same deference as his or her factual findings. *Morgan v. City of Warwick,* 510 A.2d 1297 (R.I.1986).

Applying this well-settled doctrine to the findings and conclusions of the trial justice in the case at bar—and after reviewing the testimony and documentary evidence presented to the trial justice—we are of the opinion that he did not overlook or misconceive material and relevant evidence, nor was he otherwise clearly wrong. Indeed, we believe that the evidence in the case overwhelmingly supports the trial justice's findings of fact and determination of mixed questions of fact and law.

For the reasons stated, the appeals of PC & J Contracting Co., Inc., and Harold L. Schein are denied and dismissed. The orders of the trial justice concerning the purchase of assets and the motion to reclaim are hereby affirmed. The papers in the case may be remanded to the Superior Court for the County of Newport for further proceedings.

SHEA, J., did not participate.