**STATE**

v.

**Tonya FULLER–BALLETTA.**

**No. 2008–96–C.A.**

Supreme Court of Rhode Island.

June 17, 2010.

Lauren S. Zurier, Department of Attorney General, for Plaintiff.

Paula Rosin, Office of Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case comes before the Supreme Court on appeal by Tonya Fuller–Balletta (Fuller–Balletta or acquittee) who was acquitted of murder by reason of insanity, from an order of the Superior Court committing her to the custody of the director of the Rhode Island Department of Mental Health, Retardation and Hospitals (director and MHRH respectively) [1] pursuant to G.L.1956 § 40.1–5.3–4(e), for care and treatment at an inpatient facility. The acquittee argues on appeal that: (1) the evidence presented at the hearing legally was insufficient to meet the statutorily required showing of a likelihood of serious harm to support the trial justice's finding that the acquittee is dangerous; (2) the trial justice erred when she failed to consider the precise circumstances of acquittee's conduct—resulting in homicide—which gave rise to the insanity acquittal; and (3) the trial justice should have ordered acquittee into a community-based outpatient facility instead of inpatient treatment in a public institution. For the reasons set forth in this opinion, we affirm the order of the Superior Court.

### Facts and Travel

#### A. Background and October 29, 2004

We recount the tragic events of this case that culminated in the death of Fuller–Balletta's twelve-year-old daughter. On the evening of October 29, 2004, a trooper with the Rhode Island State Police went to Fuller–Balletta's home to execute an arrest warrant that had been outstanding for fourteen years.[2] Unbeknownst to the

---

1. As of this publication, the Rhode Island General Assembly has voted to change the name of MHRH to "Department of Behavioral Healthcare, Developmental Disabilities and Hospitals."

2. According to the record, while on patrol earlier in the week, the state trooper ran plates of automobiles that drove past him. The acquittee's plate correlated with an active

state trooper, Fuller–Balletta was mentally unstable and in the midst of continuing paranoid delusions, hallucinations, and extreme behavior resulting from a mental illness that had been progressing for the previous few years.

In 2002, during an unsuccessful run for governor, Fuller–Balletta was asked to leave a pre-election debate because she was singing. The acquittee's relationship with her husband became strained; she would sit holding a baseball bat near him as he slept and sprayed him with mace. Eventually she forced her husband to leave their home. She was convinced that she was under surveillance; she believed that spies lived next door and that her telephones were bugged. She disconnected the home's alarm system, doorbell, and smoke alarms. The acquittee detached her telephone wires from her home because she was convinced that she was receiving messages through her telephones and the home's Internet service. Fuller–Balletta insisted on home-schooling her two daughters, Marina (then, age thirteen) and Talia (then, age twelve) because she did not want them to leave the house. A few days before this tragedy, acquittee turned off the furnace in her basement and began heating the house with just the kitchen stove. Fuller–Balletta never sought psychiatric help or medical treatment for her increasingly deteriorating mental state.

When the state trooper arrived at Fuller–Balletta's home shortly before 9 p.m., he explained the purpose of his visit; and, although he did not have the actual warrant, he offered to show acquittee an electronic copy of the arrest warrant. Fuller–Balletta refused to go with him to his cruiser, began cursing at the officer, and started to kick and punch him. Talia and Marina also punched and kicked the officer

warrant for her arrest for violation of banking laws.

and acquittee yelled to one of her daughters to grab a can of mace. The state trooper returned to his cruiser and called for assistance. Three additional state troopers and two Providence police officers responded to the scene; acquittee's husband also arrived.

Meanwhile, Fuller–Balletta, believing that the state trooper and her husband were part of a conspiracy against her, armed herself and her daughters with sharp butcher knives. Fuller–Balletta then barricaded herself and her daughters in a rear bedroom and set fire to the bed. She later explained that she thought it was better for her and her daughters to die than be taken by the police; additionally, she thought that the fire would spark the attention of a neighbor who was a firefighter. The acquittee told Talia and Marina that the police were there to hurt them and that they should be prepared to commit suicide.

After a failed attempt to coax acquittee out of the house, the police forcibly entered the home; they almost immediately detected the smell of smoke. They removed the bedroom door—which had been barricaded—saw the burning mattress and found acquittee and her daughters huddled near a back wall. They threatened to kill the police officers with the knives if they entered the room. One of the children stated "Mommy, just tell, just tell me, I will cut my wrists." The officers called the fire department and retrieved fire extinguishers from their vehicles.

The acquittee, now holding a knife to her daughter's throat, refused to vacate the home. Fuller–Balletta's husband knocked the knife out of her hands, and a state trooper pulled her out of the smoke-filled room; the police then pulled Marina

to safety through a window. Tragically, Talia was found near a closet, unresponsive; she was taken to Hasbro Children's Hospital, where she died four weeks later from multi-system organ failure caused by severe smoke and soot inhalation and burns over 40 percent of her body. The manner of death was ruled homicide.

## B. Superior Court Trial

The acquittee was charged with first-degree murder, first-degree arson, several counts of felony assault and resisting arrest. In November 2004, acquittee was deemed incompetent to stand trial as a result of her mental illness; she was confined to the Eleanor Slater Hospital for treatment. On June 2, 2006, a justice of the Superior Court determined that Fuller–Balletta was competent to stand trial.

A bench trial commenced on April 25, 2007. A state trooper and a firefighter testified. To establish her insanity defense, Fuller–Balletta relied on the expert testimony of Joseph Penn, M.D. (Dr. Penn), the director of the child and adolescent forensic psychiatry unit at Rhode Island Hospital. Doctor Penn conducted extensive interviews with acquittee and her family, examined medical records, and concluded that acquittee's mental functioning had been diminishing for two to three years before the fire. Both Dr. Penn and the state's expert witness, Barry Wall, M.D. (Dr. Wall), the director of Forensic Services at the Eleanor Slater Hospital, a state-run facility for the mentally ill, concluded that acquittee met the diagnostic criteria for bipolar disorder mixed episode with psychotic features. According to Dr. Penn, because of mental illness, Fuller–Balletta was "unable to appreciate the wrongfulness of her behavior and conform her behavior [to the] requirements of the law[.]" Doctor Wall agreed with Dr. Penn's diagnosis. It was his opinion that, due to her mental illness, Fuller–Balletta could not appreciate the wrongfulness of her conduct and lacked the ability to conform her actions to the requirements of the law. Based on these expert opinions, on May 25, 2007, the trial justice found Fuller–Balletta not guilty by reason of insanity.[3]

## C. Evidentiary Hearings

In accordance with § 40.1–5.3–4(b),[4] the trial justice committed acquittee to the custody of the MHRH, "for the purpose of observation and examination to determine whether [she] is dangerous." Section 40.1–5.3–4(c) required the director to submit a written report stating "whether by reason of mental disability the [acquittee's] unsupervised presence in the community [would] create a likelihood of serious harm" as that term is defined by § 40.1–

---

3. *See State v. Collazo*, 967 A.2d 1106, 1111 (R.I.2009) (recognizing that in 1979, this Court adopted the American Law Institute's Model Penal Code test for legal insanity); *see also State v. Johnson*, 121 R.I. 254, 267, 399 A.2d 469, 476 (1979) (acknowledging test for legal insanity). In *Johnson*, we held that: "A person is not responsible for criminal conduct if at the time of such conduct, as a result of mental disease or defect, his capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law is so substantially impaired that he cannot justly be held responsible." *Id.*

4. General Laws 1956 § 40.1–5.3–4(b) provides:

 "*Examination of person found not guilty.* If a person is adjudged not guilty of a criminal offense because he or she was insane at the time of its commission, the court shall commit him or her to the custody of the director [of the state Department of Mental Health, Retardation, and Hospitals] for the purpose of observation and examination to determine whether the person is dangerous."

5.3–4(a)(4).[5] The report, written by Dr. Wall, dated June 15, 2007, described Fuller–Balletta's descent into psychosis; but it recognized that, since she began inpatient treatment at Eleanor Slater Hospital and with appropriate medication, her symptoms had stabilized and her illness had been asymptomatic for an extended period. According to Dr. Wall, at the time of this post-acquittal evaluation, Fuller–Balletta's illness was in full remission and he opined that she "would be at low risk for harming others if she were to be *supervised* in the community." (Emphasis added.) He recommended, however, that her "current status in the hospital be kept the same[.]"

Upon receipt of the report, and in accordance with § 40.1–5.3–4(d),[6] in September 2007, the trial justice held an evidentiary hearing (initial hearing) on the issue of acquittee's dangerousness. Doctor Wall testified that patients such as Fuller–Balletta, who have been found not guilty by reason of insanity, were typically more dangerous if they were discharged from the hospital completely unsupervised rather than with supervision that gradually is reduced over time. According to Dr. Wall, a person with bipolar disorder, mixed episode has both phases of bipolar disorder—the manic phase and the depressive

stage—at the same time, and this circumstance increases the level of severity of the illness. He explained that, although her condition had improved markedly since her admission to the hospital, Fuller–Balletta remained at the early stages of the treatment process. Significantly, and correctly we conclude, Dr. Wall expressed concern that in the three-month interregnum from his written report to his in-court testimony, Fuller–Balletta began exhibiting signs of decompensation—she refused urine to be tested and refused to sign a treatment plan. According to Dr. Wall, these behaviors could be a "ramping up" of an active phase of her bipolar disorder.

Most importantly, for purposes of this appeal, Dr. Wall rendered an opinion about acquittee's risk of dangerousness. He testified as follows:

"The way I frame my opinion on page 5 [of the report], I think she would be at low risk if she would be supervised in the community. I recognize that [the report] does not directly address the statutory language * * * even though I didn't type it out in the report, [my opinion] is that *I think that her unsupervised presence in the community would create a likelihood of serious harm.* That likelihood would be low,

5. Section 40.1–5.3–4(c)(1) provides in pertinent part:

"Not later than twenty (20) days from the date of the order of commitment, the director shall prepare and file with the court a report, in writing, in which he or she shall state his or her opinion as to whether by reason of mental disability the person's unsupervised presence in the community will create a likelihood of serious harm, together with the medical and other data upon which his or her opinion is based."

Additionally, § 40.1–5.3–4(a)(4) defines "Likelihood of serious harm" as follows:

"(i) A substantial risk of physical harm to the person him[self] or herself as manifested by behavior evidencing serious threats of

or attempts at suicide or by behavior which will result in serious bodily harm; or

"(ii) A substantial risk of physical harm to other persons as manifested by behavior or threats evidencing homicidal or other violent behavior."

6. Section 40.1–5.3–4(d) provides:

"*Hearing.* Upon receipt of the report and appropriate notice to the director, the attorney general and the person or his or her counsel, the court shall hold a hearing at which the report shall be introduced, other evidence bearing on the question of the mental condition of the person may be introduced by the parties, and the person may testify, confront witnesses, and present evidence."

low/moderate, but to let her go completely unsupervised is something, in my opinion, would pose a risk. And it's based on the fact that she has a very serious mental illness." (Emphasis added.)

Doctor Wall was then asked if he could opine, to a reasonable degree of medical certainty, as to whether acquittee's unsupervised presence in the community would create the likelihood of serious harm. Again, he reiterated:

"[i]n my opinion her unsupervised presence in the community would create *a likelihood of serious harm.* That is relatively low, low/moderate, and she would pose a greater risk if she is unsupervised." .(Emphasis added.)

On October 15, 2007, based on the evidence presented by Dr. Wall at the initial hearing and the record before her, the trial justice found, by clear and convincing evidence, that by reason of mental illness, Fuller–Balletta's unsupervised presence in the community would create a likelihood of serious harm. Thus, the trial justice ordered that acquittee remain in the custody of the MHRH, subject to the statutorily required six-month review set forth in § 40.1–5.3–4(f).[7] It is from this order that Fuller–Balletta appeals.

We note that while this appeal has been pending, in accordance with § 40.1–5.3–4(h),[8] there have been two periodic reviews concerning Fuller–Balletta's condition and whether a likelihood of serious harm would arise if she were granted unsupervised release. Unfortunately, two reports, submitted in July 2008 and again in March 2009, established that acquittee's illness had regressed and her mental condition substantially had deteriorated. She refused to speak with her doctors, refused medical testing and examinations, exhibited violence toward another patient, and became "intensely paranoid." Based on the record before her, the trial justice determined that there was clear and convincing evidence that Fuller–Balletta's unsupervised release into the community would create a likelihood of serious harm. After each of those hearings, the trial justice ordered that Fuller–Balletta remain in the custody of the MHRH until the next review.

## Standard of Review

"A mixed question of law and fact is one in which 'the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard.'" *Johnston v. Poulin,* 844 A.2d 707, 714 (R.I. 2004) (quoting *Direct Action for Rights and Equality v. Gannon,* 819 A.2d 651, 662

7. Section 40.1–5.3–4(f) provides in pertinent part:
 *"Periodic review.* The director shall petition the court to review the condition of a person committed * * * not later than six (6) months from the date of the order of commitment and every six (6) months thereafter, or when the director no longer believes that the unsupervised presence of the person in the community will create a likelihood of serious harm, whichever occurs first."

8. Section 40.1–5.3–4(h) provides in pertinent part:
 *"Hearing on petition.* Upon receipt of a petition * * * the court shall hold a hearing

at which the parties may introduce evidence bearing on the mental condition of the person, including any reports of the director, and the person may testify, confront witnesses, and present evidence. If the court finds by clear and convincing evidence that by reason of mental disability the presence of the person in the community will create a likelihood of serious harm, it shall enter an order to that effect and he or she shall remain in the custody of the director. If the court does not so find, it shall enter an order discharging the person from the custody of the director."

(R.I.2003)). This jurisdiction grants an extremely deferential standard of review to the findings of fact of a trial justice sitting without a jury. *Cerilli v. Newport Offshore, Ltd.*, 612 A.2d 35, 39 (R.I.1992). "We shall not disturb the findings of the trial justice unless it is established that he or she misconceived or overlooked relevant and material evidence or was otherwise clearly wrong." *Id.*

■ "Additionally, this Court reviews issues of statutory interpretation *de novo.*" *International Brotherhood of Police Officers v. City of East Providence*, 989 A.2d 106, 108 (R.I.2010); *Waterman v. Caprio*, 983 A.2d 841, 844 (R.I.2009). "When the language of a statute is unambiguous and expresses a clear and sensible meaning, there is no room for statutory * * * extension * * *." *McGuirl v. Anjou International Co.*, 713 A.2d 194, 197 (R.I.1998) (quoting *Wayne Distributing Co. v. Rhode Island Commission for Human Rights*, 673 A.2d 457, 460 (R.I.1996)).

## Analysis

### A. Mootness

We begin by addressing the issue of mootness that the state raised on appeal. The record discloses that since the inception of this appeal, the director, in accordance with § 40.1–5.3–4(f), twice has petitioned the Superior Court for a periodic review of Fuller–Balletta's condition, and the trial justice has conducted two hearings. As noted, both reports submitted in connection with the hearings indicated that acquittee's illness no longer was in remission and that she was experiencing a recurrence of psychotic symptoms. Based on these reports, the trial justice found by clear and convincing evidence that Fuller–Balletta's unsupervised presence in the community would create a likelihood of serious harm. The state argues that these subsequent orders by the trial justice render acquittee's appeal from the initial commitment order moot. Additionally, the state argues that because Fuller–Balletta currently is experiencing active psychosis, she may not be discharged from MHRH custody and thus, there is no cognizable relief available to her.

"This Court has consistently held that a case is moot if the original complaint raised a justiciable controversy, but events occurring after the filing have deprived the litigant of a continuing stake in the controversy." *Credit Union Central Falls v. Groff*, 871 A.2d 364, 368 (R.I.2005) (quoting *Associated Builders & Contractors of Rhode Island, Inc. v. City of Providence*, 754 A.2d 89, 90 (R.I.2000)); *see also In re New England Gas Co.*, 842 A.2d 545, 553 (R.I.2004). Although the present posture of this case raises a question about its justiciability, we are hard-pressed to say that acquittee does not have a continuing stake in the outcome. We equally are cognizant that if an acquittee failed to appeal from the trial justice's initial finding of dangerousness and commitment based on § 40.1–5.3–4(e), an issue of mootness also would arise. Notably, once found to be dangerous and committed to the custody of the director upon a finding of not guilty by reason of insanity, the acquittee may "not be paroled, furloughed, placed on outpatient status, or released from a locked facility or otherwise released from the institution where he or she is being treated except upon petition to the court by the director" for a court order. Section 40.1–5.3–4(e). If the evidence before the hearing justice does not warrant a finding that the acquittee remains dangerous, the court "shall order that he or she be discharged at once." *Id.* Accordingly, we are of the opinion that the initial finding of dangerousness and the commitment order are relevant considerations for purposes of this appeal. *See Lynch v. Rhode*

*Island Department of Environmental Management,* 994 A.2d 64, 71 (R.I.2010) (recognizing an initial license, although "a dead letter for all purposes[,]" may still be challenged since it survives in the form of two subsequent licenses). Although we recognize that this case differs from *Lynch* in the important respect that Fuller–Balletta's present mental state is of paramount concern, and is judicially reviewed on a biannual basis, we reject the contention that this case is moot.

However, we are also mindful that the issues in this case are viewed through the lens of two subsequent reports of the MHRH, which, unfortunately, indicate that Fuller–Balletta's condition has worsened, as Dr. Wall had predicted. Although we acknowledge Fuller–Balletta's contention before this Court and the Superior Court, that if the initial order of commitment was void *ab initio,* then she should be released, and possibly recommitted pursuant to this jurisdiction's civil commitment statute, G.L.1956 § 40.1–5–8 (entitled "Civil court certification"), we disagree with her contention. Essentially counsel is asking this Court, two and a half years later, to declare the initial order invalid and to issue its own order, a result that is not in accordance with the state's forensic scheme. We decline to do so.

## B. The Burden of Proof

Before the trial justice, the parties agreed that the state bore the burden to prove acquittee's dangerousness and further agreed that the burden of proof on the issue of dangerousness was by clear and convincing evidence. Thus, for purposes of this appeal, we deem that to be the controlling burden of proof and shall review the decision under a clear and convincing evidentiary standard. However, we reserve for another day the question of whether this is the appropriate standard of proof for the initial hearing on the question of dangerousness.[9] In *Jones v. United States,* 463 U.S. 354, 363, 103 S.Ct. 3043, 77 L.Ed.2d 694 (1983), the United States Supreme Court recognized that two facts arise from a verdict of not guilty by reason of insanity: that the acquitted person has committed an act that constitutes a criminal offense and did so because the person suffers from a mental disability. *Id.* The Court recognized that Congress has declared that, standing alone, those findings were an adequate basis "for hospitalizing the acquittee as a dangerous and mentally ill person." *Id.* at 364, 103 S.Ct. 3043. The Court declined to declare that this determination was unreasonable or unconstitutional. *Id.* Significantly, in *Jones,* the Court ruled that the Constitution does not require the same standard of proof to support commitment of an insanity acquittee as the clear and convincing standard that is mandated for civil commitments. *Id.* at 366–67, 103 S.Ct. 3043. The Court recognized that the lesser standard of preponderance of the evidence satisfies the Due Process Clause. *Id.* at 366–68, 103 S.Ct. 3043 (recognizing that the fundamental differences between insanity acquittees and persons facing civil commitments negate the necessity for adopting the same standard of proof); *see also Addington v. Texas,* 441 U.S. 418, 431–33, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979) (adopting clear and convincing evidence as proper burden of proof for civil commitments). Based on the agreement of the parties, we do not reach this issue; however, we shall revisit it when it is presented in an appropriate procedural and substantive context.

## C. The Sufficiency of the Evidence

■ The standard of proof by clear and convincing evidence means:

---

9. We note that the states are not uniform in the burden of proof on the question of dan-

gerousness, nor, significantly, on which party bears the burden, the state or the acquittee.

"more than a mere exercise in semantics. It is a degree of proof different from a satisfaction by a 'preponderance of the evidence' which is the recognized burden in civil actions and from proof 'beyond a reasonable doubt' which is the required burden in criminal suits.

"To verbalize the distinction between the differing degrees more precisely * * * proof by 'clear and convincing evidence' means that [the trial justice] must believe that the truth of the facts asserted by the proponent is highly probable." *Parker v. Parker*, 103 R.I. 435, 442, 238 A.2d 57, 60–61 (1968).

▆▆▆ It is well established that after entry of a judgment of not guilty by reason of insanity in a criminal case, the question of future dangerousness of the insanity acquittee is a judicial determination and not a medical conclusion. *See Genereux v. Pelosi*, 96 R.I. 452, 456–57, 192 A.2d 630, 632 (1963) (discussing G.L. 1956 § 26–4–4, which has been codified into § 40.1–5.3–4). "Unquestionably the security of the community must be the paramount interest." *State v. Johnson*, 121 R.I. 254, 271, 399 A.2d 469, 478 (1979). As a matter of law, penal sanctions against those individuals who are found to lack criminal responsibility are withheld, and the person is acquitted by reason of that mental disease or defect. *Id.* Likewise, "[i]t would be an intolerable situation if those suffering from a mental disease or defect of such a nature as to relieve them from criminal responsibility were to be released to continue to pose a threat to life and property." *Id.* It is therefore the responsibility of the courts to assess whether the acquittee is dangerous, bearing in mind his or her protected liberty interest, as well as the public safety implications the acquittee's unsupervised release into the community might pose.

▆▆▆ We are of the opinion that the trial justice carefully considered the entire record before her and evaluated these factors, aided but not controlled by the opinion of the state's medical expert—the only witness to provide expert testimony—at the initial commitment hearing. Based on the entire record before her, the trial justice ordered that Fuller–Balletta remain at Eleanor Slater Hospital. We affirm that decision.

After a person is adjudged not guilty by reason of insanity, § 40.1–5.3–4(c) sets forth the responsibilities of the director of MHRH, and requires that the director prepare and file a report detailing "his or her opinion as to whether by reason of mental disability the [acquittee's] unsupervised presence in the community will create a likelihood of serious harm[.]" The phrase "likelihood of serious harm" is defined as:

"(i) A substantial risk of physical harm to the person him[self] or herself as manifested by behavior evidencing serious threats of or attempts at suicide or by behavior which will result in serious bodily harm; or

"(ii) A substantial risk of physical harm to other persons as manifested by behavior or threats evidencing homicidal or other violent behavior." Section 40.1–5.3–4(a)(4).

Thus, by engrafting onto the definition of "likelihood of serious harm" a "substantial risk of physical harm" to the person herself or others, the statute required Dr. Wall to state whether, by reason of her mental disability, Fuller–Balletta's "unsupervised presence in the community will create [a substantial risk of physical harm to the person * * * as manifested by behavior evidencing serious threats of or attempts at suicide or by behavior which will result in serious bodily harm; or * * * [a] substantial risk of physical harm to other

persons as manifested by behavior or threats evidencing homicidal or other violent behavior]." Section 40.1–5.3–4(c); 40.1–5.3–4(a)(4).

As noted, in his written report, Dr. Wall stated that at the time of her evaluation in June 2007, Fuller–Balletta was in full remission and "would be at low risk for harming others if she were to be supervised in the community." However, during the initial hearing, Dr. Wall explained his reasoning and expanded upon Fuller–Balletta's risk of dangerousness:

"The way I frame[d] my opinion on page 5, I think she would be at low risk if she would be supervised in the community. I recognize that that does not directly address the statutory language * * * even though I didn't type it out in the report, is that *I think that her unsupervised presence in the community would create a likelihood of serious harm. That likelihood would be low, low/moderate,* but to let her go completely unsupervised is something, in my opinion, would pose a risk." (Emphasis added.)

He then repeated his opinion as to a reasonable degree of medical certainty:

"[i]n my opinion her unsupervised presence in the community *would create a likelihood of serious harm. That is relatively low, low/moderate,* and she would pose a greater risk if she is unsupervised." (Emphasis added.)

Before this Court, Fuller–Balletta argues that Dr. Wall's reference to a "low, low/moderate likelihood of serious harm" is a lower level of risk than the "substantial risk of physical harm" that § 40.1–5.3–4(a)(4) mandates. However, he was not required to estimate the level of risk associated with his opinion that her unsupervised presence would create a likelihood of serious harm. The acquittee contends that the trial justice erred when she committed Fuller–Balletta to inpatient treatment

based on Dr. Wall's testimony about a "low, low/moderate risk." This somewhat semantical argument overlooks the duty of the trial justice, after a finding of not guilty by reason of insanity, to view the entire record—including the report and expert testimony—and decide whether the acquittee is dangerous. This is a legal finding, not a medical determination.

 We note that the statute does not require an assessment of the level of risk for a "likelihood of serious harm." It is § 40.1–5.3–4(a)(4) which defines "likelihood of serious harm" and references a substantial risk of serious physical harm. It is not the function of the Court to add language to an otherwise clear and unambiguous enactment. *See McGuirl,* 713 A.2d at 197. Section 40.1–5.3–4(c) requires that the director state his or her opinion of whether Fuller–Balletta's unsupervised presence in the community would create a likelihood of serious harm and does not assign any specific level of risk associated with that likelihood. The term "likelihood" is defined as "[t]he state of being probable; probability." The American Heritage Dictionary of the English Language 1042 (3d. ed. 1996). This is a meaning that is commonly understood.

The trial justice examined the evidence compiled during the initial hearing as well as the record as a whole, including the report of the director, the horrific crime of which Fuller–Balletta was acquitted based on her mental illness, and significantly, her deteriorated mental state from the time of the acquittal to the commitment hearing. She set forth her statutory obligations, acknowledged the agreed-upon burden of proof, and reviewed the facts in this case. The trial justice recognized that at the time Dr. Wall prepared his report, Fuller–Balletta was asymptomatic; she concluded that this improved condition was based on three years of supervised care and treat-

ment at the hospital. She noted Dr. Wall's real concern that acquittee should not be released into the community unsupervised, but rather gradually, over time as her treatment warranted. The trial justice found that there were factors that made Fuller–Balletta's risk for harming others increase or decrease; but she added that it was difficult to accurately predict the level of risk associated with a person who suffers from this illness. The trial justice concluded that Fuller–Balletta's condition was regressing, notwithstanding her continued hospitalization in a controlled environment. Significantly, the trial justice stated:

> "[Dr. Wall's] general position was that [Fuller–Balletta] should stay at the hospital at this point in time and go back to a more restrictive commitment. * * * His main concern was for her and her well-being, from his testimony and certainly his obligations to the State and well being of others, but there's no question I think at this point in time of Dr. Wall's opinion that she not be placed in the community unsupervised and there's been no contradiction to that testimony. The testimony as indicated was given in a full report, written report, and under extensive questioning by both attorneys in the court. * * * [Fuller–Balletta] was not able or should not be released without supervision, [in] that she would present a risk of serious harm to others. *There is no other evidence before the Court.*" (Emphasis added.)

It is our opinion that the trial justice did not err when she found that Fuller–Balletta's condition met the test of dangerousness and ordered her committed to inpatient treatment in a public institution. The state met the agreed-upon burden of proof of clear and convincing evidence, and acquittee presented no evidence in rebuttal.

### D. Remaining Issues on Appeal

The acquittee's second argument on appeal is that the trial justice erred (1) when she overlooked the circumstances that led to the homicide in this case and (2) further erred when she failed to take into consideration Fuller–Balletta's "lack of intentionality and malice." Fuller–Balletta argues on appeal that "but for the fact that [the state trooper] showed up at [acquittee's] house at night * * * [acquittee] would not have posed a threat of harm and would not have harmed anyone." This argument is without merit.

The events that precipitated Fuller–Balletta's delusions are not relevant at this stage of the proceedings. This incident began when a state trooper rang Fuller–Balletta's doorbell. Given her extreme psychosis, any number of events could have been the catalyst for a similar delusion and psychotic response. Additionally, it matters not that acquittee thought that she was protecting her daughters from a police conspiracy. As the state argues, the motivation behind acquittee's bizarre and dangerous behavior has no bearing on this case. The fact remains that acquittee, who was suffering from paranoid psychosis as a result of severe mental illness, was so delusional that her actions killed her daughter. The underlying event that triggered this particular episode of psychosis has no bearing on the question of dangerousness.

Fuller–Balletta's third argument on appeal is that the trial justice erred by not ordering the MHRH to place her in a community-based outpatient setting. We reject this contention because § 40.1–5.3–4 does not, in any way, grant the trial justice the authority to order such a placement.

In addressing the question of an acquittee's dangerousness, the trial justice is

constrained by the terms of § 40.1–5.3–4(e). Section 40.1–5.3–4(e) provides:

> "*Commitment of person.* If the court finds that the person is not dangerous it shall order that he or she be discharged at once. *If the court finds that the person is dangerous it shall commit him or her to the custody of the director for care and treatment as an inpatient in a public institution.* A person committed under this subsection shall not be paroled, furloughed, placed on outpatient status, or released from a locked facility or otherwise released from the institution where he or she is being treated except upon petition to the court by the director, on notice to the attorney general and the person or his or her counsel, and entry of an order by a judge of the court authorizing the release." (Emphasis added.)

Thus, at the conclusion of the initial hearing, the trial justice has two options—discharge or commitment. If the trial justice determines that the insanity acquittee is not dangerous, then the acquittee must be released forthwith. If the trial justice finds that the person is dangerous, then the acquittee must be committed to inpatient care in a public institution. Section 40.1–5.3–4(e).

 As discussed above, the trial justice in this case found that Fuller–Balletta was dangerous; thus, the statute required inpatient treatment. "It is well settled that when the language of a statute is clear and unambiguous, this Court must interpret the statute literally and must give the words of the statute their plain and ordinary meanings." *Waterman*, 983 A.2d at 844 (quoting *Iselin v. Retirement Board of the Employees' Retirement System of Rhode Island*, 943 A.2d 1045, 1049 (R.I.2008)). "When the language of a statute expresses a clear and sensible meaning, this [C]ourt will not look beyond it."

*Such v. State*, 950 A.2d 1150, 1158–59 (R.I. 2008) (quoting *First Republic Corp. of America v. Norberg*, 116 R.I. 414, 418, 358 A.2d 38, 41 (1976)). The statute does not allow for the trial justice to make a determination that an acquittee is dangerous, but then assess the level of risk and *sua sponte* order the acquittee into a less restrictive program than the statute requires. Accordingly, we reject this contention.

### Conclusion

For the reasons stated in this opinion, we affirm the order of the Superior Court. The record may be remanded to the Superior Court.