STATE

v.

Nicholas GIANQUITTI.

No. 2010–8–C.A.

Supreme Court of Rhode Island.

June 17, 2011.

Lauren S. Zurier, Department of Attorney General, for State.

John A. MacFadyen, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice GOLDBERG, for the Court.

This case came before the Supreme Court on April 6, 2011, on appeal by the defendant, Nicholas Gianquitti (Gianquitti or defendant), from a judgment of conviction in the Providence County Superior Court. Gianquitti was convicted of second-degree murder and using a firearm while committing a crime of violence. On the murder conviction, Gianquitti was sentenced to forty years in the Adult Correctional Institutions, twenty years to serve, the remainder suspended, with probation. Gianquitti also received a mandatory life sentence to be served consecutively to the murder, for the firearm conviction. The defendant appealed to this Court, contending that the trial justice erred (1) by refusing to instruct the jury in accordance with G.L.1956 § 11–8–8, and denying his subsequent motion for a new trial on the same basis; and (2) by excluding expert testimony. For the reasons set forth in this opinion, we affirm the judgment of conviction.

### Facts and Travel

On a Sunday afternoon in May 2008, the Pagano children and their cousins were playing baseball in the street near their home, located at Daisy Court in Cranston, Rhode Island. Their lives soon would be altered irrevocably. When the tennis ball they were using in their game of baseball

hit Gianquitti's car, defendant immediately went outside to check for damage to his vehicle. The children assured defendant that it was only a tennis ball that hit the car, to which he replied, "I don't give a [f- - -] if it's [a hard ball] or a [soft ball]. Now move your [f- - -]ing game up the street so you don't ruin my [f- - -]ing car." [1]

The game was over. The children went inside and informed their parents about their encounter with Gianquitti and the language he had used. Upon hearing that defendant had yelled and swore at the children, James Pagano (James or decedent) stood up and walked over to defendant's house, closely followed by his father, Anthony Pagano (Anthony). After knocking several times to no avail, James said, "[w]ise decision, Nick, not to answer the door." As James turned around to leave, defendant opened the door.

A verbal altercation ensued, and vulgarities were exchanged. James repeatedly told defendant that he did not want him swearing at his children. Anthony informed defendant that he was "acting like a jerk swearing at the children." Then, as James and Anthony turned to leave, Gianquitti said, "hey, Jimmy." When James turned around, defendant raised his finger in a common obscene gesture and said, "[f- - -] you." James immediately responded by stepping onto the landing and punching defendant on his right cheek.

What next transpired was hotly disputed at trial. Witnesses for the state testified that the force of the blow caused Gianquitti to reel backwards and to stumble down a short staircase. James similarly staggered over the front landing and into the house. As James regained his balance and stood up in the foyer, Anthony saw defendant pull out a gun. He alerted his son, who turned and ran; however, before James could exit the house, defendant shot him in the back; the bullet entered the lower left portion of his back. Gianquitti chased a mortally wounded James outside; a second gunshot was fired; that bullet was later discovered to have hit the sidewalk across the street. James took shelter behind a car in defendant's driveway. Anthony testified that defendant, still holding his gun, stood over James, and said, "I gotcha now, Jim[.]" James' mother—who had been standing outside the Pagano house—ran over to help her son and yelled for defendant to leave. Gianquitti eventually went back inside his house to await the arrival of the police.

The defendant testified and described a different scenario; he stated that at the time of the baseball game he was cleaning the house and was armed while doing so. When he opened the door to James and Anthony Pagano, James was in a rage. Both James and his father were "blaring obscenities at [defendant,]" and James kept yelling, "[d]on't you [f- - -]ing swear at my kids." According to Gianquitti, he "couldn't get a word in edgewise[;]" but he informed the Paganos that he "just told the kids to go down [to] the end of the street[,]" and stated that he "just [didn't] want them near my car." Eventually Gianquitti told James to "get the [f- - -] off my stairs," at which point defendant testified that James lunged inside and "punched [him] in the face."

1. At trial, Gianquitti denied having yelled at the children. He testified that he requested the children to "go [to] the end of the street and play with the balls[,]" because he didn't "want dents all over [his] car." The defendant further testified that when one of the children said it was only a tennis ball, he stated, "I don't give a shit what it is. You guys are out here with baseballs all the time too." When questioned if he ever said "[m]ove your game down the f[- - -]ing street[,]" Gianquitti stated that he "never swore at those kids, in the three years I lived there[.]"

According to defendant, he then stumbled backwards down the short staircase and landed on his backside at the bottom landing. He saw James "barreling down" the stairs toward him "in a rage[,]" and defendant told him, "[n]o, stop." Fearing that James would tackle him and possibly use defendant's gun against him or his wife, Gianquitti grabbed the gun he had holstered at his waist and shot James.[2] The defendant then got up and ran after James, to "make sure he wasn't coming back[.]" He testified that he did not recall firing a second shot. When he reached the place where James had collapsed, he said "James, don't you be dead, don't you be [f- - -]ing dead." Gianquitti testified that he stayed by the car because he wanted to help, but once James' mother and others arrived, he went back inside to wait for the police.

James was transported by rescue to Rhode Island Hospital, where he died later that afternoon. The autopsy revealed that the bullet entered James' left lower back at an upward angle, severed his aorta, and ultimately was lodged in the liver. The defendant was indicted and ultimately convicted of second-degree murder, in violation of G.L.1956 § 11–23–1, and using a firearm in the commission of a crime of violence, in violation of G.L.1956 § 11–47–3.2(b).

## Analysis

### I

### Presumption of Reasonableness Pursuant to § 11–8–8

■ Section 11–8–8 provides that if a person dies in the course of a breaking and entering, "it shall be rebuttably presumed as a matter of law * * * [that the] occupier of the place where the offense was committed acted by reasonable means in self-defense * * *." At the close of evidence at trial, the defendant sought to avail himself of this evidentiary presumption by arguing that James gained access to defendant's home unlawfully by committing the felony offense of breaking and entering. After hearing arguments from both parties, the trial justice noted that, according to defendant's own testimony, the door to his home was wide open during this confrontation. Accordingly, the trial justice found that there was nothing that would suggest that defendant intended to prevent entry into his home and that, therefore, there was no evidence of a breaking and entering crime. The trial justice denied defendant's request to instruct the jury that there was a rebuttable presumption that defendant acted by reasonable means of self-defense, in accordance with § 11–8–8.

On appeal, defendant contends that the trial justice committed prejudicial error in refusing to instruct the jury under § 11–8–8.[3] He argues that the trial justice's refusal to give this instruction was "predicated on a technical argument by the state: that § 11–8–8 is triggered by evidence of a breaking and entering and there could be no break where the person passed through an open door."

■ The determination of whether a defendant is entitled to a jury instruction under § 11–8–8 is a mixed question of law

---

**2.** The defendant apparently usually was armed when he left his house and had carried the licensed firearm to Benny's earlier in the day.

**3.** We note that the trial justice did instruct on self-defense and the Castle Doctrine and there was no objection to the charge. *See Mosby v. Devine,* 851 A.2d 1031, 1043–44 n. 7 (R.I. 2004) ("The Castle Doctrine is a recognized exception to the duty to retreat before one may employ deadly force to repel an attack [in one's home] * * *.").

and fact. Such a question is "one in which the rule of law is undisputed," but the issue confronting the trial justice "is whether the facts satisfy the statutory standard." *State v. Fuller–Balletta,* 996 A.2d 133, 139 (R.I.2010) (quoting *Johnston v. Poulin,* 844 A.2d 707, 714 (R.I.2004)). This Court consistently has held that factual findings of a trial justice sitting without a jury are granted an extremely deferential standard of review. "We shall not disturb the findings of the trial justice unless it is established that he or she misconceived or overlooked relevant and material evidence or was otherwise clearly wrong." *Fuller–Balletta,* 996 A.2d at 140 (quoting *Cerilli v. Newport Offshore, Ltd.,* 612 A.2d 35, 39 (R.I.1992)). Obviously, we employ a *de novo* standard of review to the trial justice's conclusions of law. *Waterman v. Caprio,* 983 A.2d 841, 844 (R.I. 2009) (citing *Hilley v. Lawrence,* 972 A.2d 643, 649 (R.I.2009)).

This Court has declared that, to satisfy the element of a break under § 11–8–2, entitled "Unlawful breaking and entering of dwelling house[,]" the evidence must show "the removal of [an] obstruction which, if left as found, would prevent the entering." *State v. Simpson,* 611 A.2d 1390, 1393 (R.I.1992). " 'This action implies the use of force, no matter how slight.' " *Id.* In the case at bar, although the trial justice found that no breaking occurred because James entered through a "wide open" door, defendant argues that "passage through [defendant's] open door could occur only because [Gianquitti] had been struck violently in the face and was forced to stagger backwards out of the way."

Although such force could be sufficient to constitute a break in some situations, in the case at bar it does not suffice. The trial justice found that there was no evidence to suggest that Gianquitti intended to prevent entry by blocking the doorway. Furthermore, there is no evidence that James struck defendant to enter the house by removing an obstruction. Rather, the testimony presented in this case established just the opposite—that it was the force of the blow that caused James to lose his balance and stumble over the threshold and into the home. Thus, we see no reason to disturb the findings of the trial justice in declining to instruct the jury in accordance with § 11–8–8 and in his denial of defendant's subsequent motion for a new trial on the same grounds.

## II

### Exclusion of Expert Testimony

■ The defendant next contends that the trial justice abused his discretion in excluding the expert testimony of William Lewinski, Ph.D (Dr. Lewinski). Doctor Lewinski is a behavioral scientist, who testified that he conducts research focusing on human behavior with respect to deadly force. Specifically, he has conducted research comparing the time to draw and shoot in response to a threatening person, with the time it takes the threatening person to turn around. The defendant sought to introduce Dr. Lewinski's testimony to support his claim of self-defense and to buttress defendant's contention that he feared for his life at the time he made the decision to shoot the decedent.

After an extensive pretrial hearing—conducted several months in advance of trial—the trial justice made a preliminary decision to exclude the testimony. He found that "it is not beyond the normal ken of a juror to understand and appreciate, accepting [defendant's] theory that [James] was not turning his back to him when he decided to unleash a shot, that when the gun was produced, [James] turned, out of fear that he would be shot." The trial justice abundantly made clear

that his ruling was preliminary in nature. It is also critical that in light of the fact that the *in limine* hearing was conducted well in advance of trial, Dr. Lewinski, at that point in time, did not have all of the forensic evidence he required to render an opinion and did not express any opinion during the hearing. The record discloses that defendant's counsel inquired of the trial justice, "[j]ust so I understand, you're indicating that this is a preliminary decision right now[,]" and the trial justice replied, "based upon what I have before me, I think that's the way I'm going to rule, because, unless things change, I don't know how it's going to change. Tell me things are different; then I'll listen to you." The defendant did not renew his objection to this ruling at trial, nor, at any point in the trial, did he make an offer of proof about what Dr. Lewinski would opine if he were allowed to testify.

 The admissibility of expert opinion testimony is within the sound discretion of the trial justice. *State v. Stone,* 924 A.2d 773, 779 (R.I.2007). Thus, "[t]his [C]ourt will not disturb a trial justice's decision regarding the admissibility of expert testimony unless it finds that the justice abused his or her discretion." *Laverty v. Pearlman,* 654 A.2d 696, 704 (R.I. 1995). In this case, we note that the trial justice made a preliminary ruling that excluded this opinion testimony. Indeed, the record discloses that Dr. Lewinski had not completely formulated an opinion at the time he was examined during *voir dire.* Thus, because it was clear that the defendant understood he was free to renew his proffer at trial, and that the trial justice

was willing to reconsider his ruling, we deem this issue waived. The defendant failed to renew his objection and did not preserve the issue for appellate review.[4]

### Conclusion

For the reasons set forth in this opinion, the judgment of the Superior Court is affirmed. The papers in this case may be returned to the Superior Court.

4. Furthermore, were we to assume that the issue properly was before us, the extensive *voir dire* hearing testimony demonstrates to our satisfaction that the trial justice did not abuse his discretion when he excluded the opinion testimony. The trial justice conducted a careful colloquy with Dr. Lewinski and

the attorneys that spans over 100 pages of transcript; he also thoroughly and thoughtfully explained his reasoning for excluding the expert's opinion. Because we are satisfied that the trial justice properly excluded Dr. Lewinski's testimony, we will not disturb his ruling.